**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| |
|---|
| VISHAL SAXENA, PH.D |
| Plaintiff, |
| v. |
| UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL |
| Defendant. |

Civil Action No. 4:19-cv-40007-TSH

**AMENDED COMPLAINT AND JURY DEMAND**

Parties

1.  The Plaintiff, Vishal Saxena, Ph.D. (hereinafter "Dr. Saxena" or "Plaintiff"), is an individual who maintains a residence at 8 Sumner St, Apt 2, Marlborough Middlesex County, Massachusetts.

2.  The Defendant, University of Massachusetts Medical School (hereinafter "School" or "UMMS") is a for-profit organization providing medical education with a place of business located at 55 North Lake Avenue, Worcester, Worcester County, Massachusetts.

Facts

3.  Dr. Saxena is 47 years old and was born in India. Dr. Saxena obtained his Ph.D. from the Massachusetts Institute of Technology.

4.  Dr. Saxena is a person with a disability. Dr. Saxena has a well-documented reactivity to formaldehyde that interferes with major life activities including breathing, seeing and thinking.

5.  When exposed to formaldehyde, Dr. Saxena suffers serious symptoms, including but not limited to severe difficulty breathing, shortness of breath, severe cough, severely blurred vision, double vision, swelling of the eyes, burning of the eyes, eye itching, burning sensation in the lungs and nasal passages, chest tightness, disorientation, trouble concentrating and other painful effects.

6. Formaldehyde is a carcinogen classified as a toxic, corrosive, and sensitizing chemical. It is a noxious chemical that is very well known to cause serious health problems. It is a colorless, strong-smelling gas.

7. It has a well-established tendency to irritate human airways and eyes. It is common for human beings to have sensitivity and reactivity to formaldehyde.

8. Formaldehyde is known to cause chronic skin disorders and cancer. The cancers of greatest concern are throat cancer, nose cancer and myeloid leukemia. Exposure to formaldehyde can increase the chance of getting cancer even at levels too low to cause symptoms.

9. Dr. Saxena is a medical student at the University of Massachusetts Medical School (UMMS).

10. He enrolled at the school in or about August 2014.

11. Prior to the start of the anatomy coursework, Dr. Saxena communicated to the school that his disability would interfere with his ability to complete the required anatomy coursework.

12. UMMS is an agency or creation of the Commonwealth of Massachusetts.

13. UMMS uses cadavers preserved in formaldehyde for its anatomy courses.

14. There are a variety of safe and affordable alternatives to using cadavers preserved in formaldehyde. The same educational objectives can be achieved safely using frozen cadavers, virtual techniques, plastic cadavers, online course work and other methods.

15. The practice of UMMS requiring students to use cadavers soaked in formaldehyde discriminates against people with disabilities who cannot tolerate exposure to formaldehyde without suffering physical pain, mental harm, physical harm and other injuries.

16. Dr. Saxena met with Phil Fournier, ("Dr. Fournier") his advisor, in early September 2014 and reported age harassment by students often in front of faculty. Dr. Fournier responded by threatening Dr. Saxena about his vaccination status.

17. Dr. Saxena has repeatedly notified UMMS and his anatomy instructor, Anne Gilroy ("Ms. Gilroy") of his severe reactivity to formaldehyde as early as September, 2014.

18. About late September 2014, Susan Gagliardi ("Dr. Gagliardi"), UMMS Vice Chair of Medical Education, acknowledged Dr. Saxena's concern about his severe reaction to formaldehyde, and asked Dr. Saxena to see a Student Heath

primary care physician, Joseph DiFranza ("Dr. DiFranza"). Dr. Saxena was told he would be evaluated and that Environmental Health and Safety Services would work directly with Student Health to implement whatever action may be needed.

19. Dr. DiFranza's findings were that Dr. Saxena should not go into the anatomy laboratory due to the risk of formaldehyde exposure.

20. Dr. Saxena then received communication from the Student Health Services that he was to be fitted with a respirator despite Dr. DiFranza's conclusion that Dr. Saxena should not enter the laboratory even with a respirator.

21. Dr. Saxena was then asked to provide letters from physicians which was counterintuitive since UMMS itself (via its physician) had made the determination that Dr. Saxena should not enter the laboratory.

22. Because Dr. Saxena demurred in entering the laboratory with a respirator, and even though Dr. Gagliardi had earlier stated that they would work to implement "whatever action may be needed" in sending Dr. Saxena to be evaluated by Dr. DiFranza, Dr. Gagliardi retaliated by next sending Dr. Saxena to the ADA Office to meet Deborah Harmon-Hines ("Dr. Harmon-Hines"), Chair of the Accommodations Committee. Thus, UMMS continually moved the requirements needed for Dr. Saxena to complete anatomy and to get an accommodation.

23. There, Dr. Saxena was offered the possibility of a frozen cadaver, with Dr. Harmon-Hines saying in response to Dr. Saxena's concerns about this process taking too long that his program may have to be extended to five years or more.

24. During this process, Dr. Harmon-Hines was very hostile and mentioned Dr. Saxena's Indian origin for no attributable reason.

25. During this process, Dr. Harmon-Hines misrepresented herself as a physician and asked about Dr. Saxena's medical history as if she were conducting a diagnosis.

26. She also refused to accept a letter outlining Dr. Saxena's severe reactions to formaldehyde by his physician.

27. Dr. Saxena then wrote to Terence Flotte, ("Dr. Flotte") the Dean of UMMS with his concerns about the way Dr. Harmon-Hines had interacted with him and asked for a meeting.

28. Dr. Flotte refused to meet with Dr. Saxena or address these concerns but instead asked Dr. Saxena to meet with Deborah DeMarco ("Dr. DeMarco"), Co-Chair of the ADA Accommodations Committee. This was surprising, since Dr. DeMarco was listed as the ADA officer for employees (not students) at UMMS.

29. On or about October 3, 2014 after meeting with Dr. Harmon-Hines, Dr. Saxena met with Dr. Fournier, his advisor who sent a threatening email demanding to meet with Dr. Saxena. During the meeting, Dr. Fournier again threatened him about vaccines. He too stated that Dr. Saxena's course of study could be delayed to 5 or more years and also said, "I'm sure you're in good health". He further said, "This is a small medical school" and that Dr. Saxena "should not make trouble because things can get around".

30. In early October of 2014, Dr. Saxena met with Dr. DeMarco. Dr. DeMarco refused to accept a written note from his primary care doctor and asked for written letters from specialists.

31. It was after this meeting that Dr. Saxena was presented with a set of unreasonable "accommodations" by the School.

32. One of the accommodations (dissecting a calf heart for a half hour) was reasonable as the school recognized his needs and stated that he would be safe in a room with a completely separate air handling system so as not to be exposed to any chemicals.

33. However, the School then asked him to complete the remainder of the lab work in an area where he would have been exposed to formaldehyde. This other 'accommodation' was to enter the lab in a hazmat suit. UMMS has continuously insisted on Dr. Saxena wearing such a suit. While recognizing a separate air handling system for a half-hour accommodation, UMMS offered an unreasonable accommodation for the majority of the coursework.

34. However, on information and belief, UMMS knew that this proposed accommodation was unreasonable for many reasons.

35. First, makers of such suits advise that a hazmat suit cannot be worn for more than a few minutes because they soon become unbearably hot and tax the cardiovascular and respiratory systems. This would not allow Dr. Saxena to complete the anatomy course work.

36. Further, a hazmat suit cannot prevent exposure. Again, all doctors have unanimously and strongly recommended that he should not enter any environment where there is formaldehyde even with protective gear such as a hazmat suit. Such a suit will also necessarily expose him to formaldehyde when the suit is donned and doffed. Hazmat suits cause claustrophobia and claustrophobia is much worse when one is either uncomfortable from breathing difficulties or when one is warm/hot.

37. Further, communication is impossible through such a suit and if Dr. Saxena had cardiovascular and respiratory issues, he would not be able to communicate his needs to fellow students and faculty focused on learning.

38. Further, such suits are heavy and cumbersome and would interfere with the delicate task of anatomy dissection. For protection against formaldehyde, a hazmat suit should have its own air handling system such as an oxygen tank and this would make it even heavier.

39. When Dr. Saxena demurred about the non-safe accommodation, Dr. DeMarco then communicated with Dr. DiFranza, the primary care physician at the Student Health clinic without Dr. Saxena's prior consent.

40. After being presented with a set of unreasonable accommodations, Dr. Saxena met with Ms. Gilroy, the Anatomy Instructor who further created a hostile environment.

41. For example, she refused to allow Dr. Saxena to use the Anatomage table (an electronic 'table' that displays anatomical information and allows students to learn anatomy).

42. For example, when Dr. Saxena communicated to her that he had communicated with physicians outside the country, she said that UMMS only accepts evaluations from American physicians, thus attacking his national origin.

43. For example, she stated that Dr. Saxena should just "do as he was told" and that he was "choosing to make trouble for the school".

44. For example, she stated that Dr. Saxena should "leave the school; go get a job". On information and belief, this comment was an attack on Dr. Saxena's age.

45. Thereafter, with great hardship, Dr. Saxena was able to obtain two letters from specialists. One was from Dr. David Christiani, a pulmonologist and an occupational medicine specialist at Massachusetts General Hospital and Harvard Medical School. The second was from Dr. Weihong Zhang, an allergist at Tufts Medical Center.

46. Both of these physicians recommended that the school should provide him with an alternate way to study anatomy and stated that he cannot enter the laboratory, even with protective gear.

47. The obvious accommodation was to use a frozen cadaver.

48. However, the previous offer of a frozen cadaver made by the ADA Committee chair, Dr. Harmon-Hines was then ignored.

49. In November 2014, Dr. Saxena received a letter from Dr. DeMarco containing several falsehoods. It confused his primary care doctor with Dr. Fournier, his advisor. It also stated that Dr. Saxena had refused to see an allergist that his

primary care physician had recommended. This was illogical because letters from specialists had just been submitted. Further conditions were added.

50. In November 2014, Dr. Saxena met with Michael Kneeland, ("Dr. Kneeland") Associate Dean of Student Affairs, regarding his anatomy laboratory accommodations.

51. In that meeting, Dr. Saxena raised concerns about how UMMS was constantly changing the requirements needed for a solution and Dr. Kneeland agreed that this should not happen.

52. Without relevance, Dr. Kneeland asked where Dr. Saxena is from, referring to his national origin.

53. Dr. Saxena then consulted with an attorney who wrote to Dr. DeMarco offering to help the accommodations process along. She refused to speak to him and further increased the accommodation criteria by asking for outside opinions.

54. Dr. DeMarco also stressed the fact that the accommodation offer (of a hazmat suit) earlier made was temporary, and she continued to refer to Dr. Saxena's disability as a "presumed allergy" even after being supplied with letters from specialists.

55. Dr. DeMarco was not acting in good faith. Rather than provide some relief after obtaining the specialists' evaluations, she complained about the length of time it had taken to provide the evaluations. She also contacted Dr. DiFranza without Dr. Saxena's consent.

56. In December 2014, UMMS sent Dr. Saxena a communication asking him to drop the anatomy class.

57. Dr. Saxena refused and continued to try to find a reasonable accommodation to complete his anatomy coursework.

58. About January 2015, his attorney sent another letter to UMMS highlighting the various events and his need for an accommodation.

59. UMMS continued to cite only Dr. DiFranza's opinion, who is not a specialist (and who had in his evaluation of Dr. Saxena concluded that Dr. Saxena should not enter the lab) while ignoring the specialists' letters that Dr. Saxena had submitted.

60. At this time, UMMS violated Dr. Saxena's HIPPA rights because UMMS spoke to Dr. DiFranza without his consent.

61. UMMS continued to thwart Dr. Saxena's ability to complete the anatomy coursework.

62. For example, anatomy exams have two components – a lab component (that Dr. Saxena could not enter) and a separate written component (that Dr. Saxena was able to take).

63. For the last written anatomy exam, a changed duration of exam time for both the lab and written components was announced in the anatomy lab component, but because Dr. Saxena could not enter the lab component, he was not able to hear this. This necessitated an earlier start time for the written component and Dr. Saxena was thus late for the exam. The proctor was extremely aggressive about it. He was told to chase his exam at the proctor's office. As a result, Dr. Saxena spent 45 minutes trying to locate his exam because it was not at the proctor's office. Later, it turned up with Ms. Gilroy in her office.

64. Dr. Saxena was told by a senior administrative person that in all her years at UMMS, she had never seen anyone's exam being taken away.

65. Finally, in February 2015 Dr. Saxena was forced to drop the anatomy coursework as no accommodation was ever provided.

66. In May of 2015 Dr. Saxena was negligently exposed to formaldehyde in another course, which hospitalized him.

67. In approximately early summer 2015, Dr. Saxena met with Sonia Chimienti ("Dr. Chimienti"), the new Associate Dean for Student Affairs related to his ongoing need for a reasonable accommodation.

68. Rather than provide him with a safe and reasonable way to complete the anatomy laboratory coursework over the summer, she suggested that he spend the summer preparing for a committee meeting that would be convened to discuss his case and whether he could continue on to the second year.

69. This meeting was to occur at the end of July 2015, barely a week before classes would restart.

70. UMMS continued not to offer Dr. Saxena a reasonable accommodation, either in the form of a frozen cadaver, performing the coursework elsewhere and transfer the credits, or any other reasonable solution.

71. At that time, Dr. Saxena also raised concerns to Dr. Chimienti about harassment by students at the school where his age and national origin/race seemed to be underlying issues.

72. Dr. Saxena had previously raised these concerns with Dr. Fornier, who offered no assistance in eradicating the student harassment based upon Dr. Saxena's age and national origin and in fact in response had threatened Dr. Saxena about vaccines.

73. Dr. Saxena had also previously complained about Dr. Fournier, to Dr. Kneeland, and these complaints had been ignored. Dr. Fournier, along with UMMS, eventually acknowledged in writing that he had threatened Dr. Saxena. Dr. Chimienti asked Dr. Saxena to file a complaint in writing against Dr. Fournier.

74. About the end of July 2015, the meeting with the committee occurred and dealt solely with his medical need for an accommodation and the possibility of providing Dr. Saxena with a frozen cadaver.

75. On or around August 21st 2015, after three weeks, the results of the July committee meeting were communicated to Dr. Saxena, and he was notified in early September via mail of those results.

76. The letter itself was backdated to August 19, the very day Dr. Chimienti emailed Dr. Saxena that she was holding off on sending him the letter.

77. The results were that Dr. Saxena's accommodation would be worked out with the anatomy instructors with input from the accommodations office (**as needed**). This highlighted that the accommodations office wasn't necessary in providing accommodations.

78. On August 25, 2015, Dr. Saxena still had no response to his request for a new advisor.

79. Therefore, he sent an email to Dr. Chimienti mentioning that he still felt threatened and she responded that she would look into it.

80. At that time, the complaint about advisor Dr. Fournier was being investigated by David Hatem ("Dr. Hatem") and Michael Ennis ("Dr. Ennis"). In meetings with them, Dr. Saxena explained that several students had been harassing him based on his age and national origin and that when he mentioned this to Dr. Fournier, he threatened Dr. Saxena and said that his lack of vaccinations could pose trouble for him later on and didn't respond to his complaint about students' mistreating him due to his age and national origin.

81. Eventually, his advisor was changed to Jerry Durbin ("Dr. Durbin") and it was acknowledged in writing, by UMMS and by Dr. Fournier that he had threatened Dr. Saxena.

82. On information and belief, no further action has been taken against Dr. Fournier or any of the students who mistreated Dr. Saxena.

83. Dr. Saxena continued to face a threatening environment in his coursework led by Dr. Fournier. A senior student instructor under the supervision of Dr. Fournier physically abused Dr. Saxena.

84. Furthermore, other students seemed to be privy to Dr. Saxena's medical history (and his disability) including conditions inferred by Dr. Harmon-Hines, with students often remarking 'aha I think I saw something' during clinical skills lab sessions.

85. Furthermore, during a clinical skills lab Dr. Fournier himself searched for signs of such alleged medical conditions while conducting various physical exams on Dr. Saxena.

86. In September 2015 just before anatomy was to begin, Dr. Saxena had a meeting with Julie Jonassen ("Dr. Jonassen"), Co-Course Director of Anatomy and Dr. Chimienti.

87. He was told in writing that the other Co-Course Director of Anatomy coursework, Ms. Gilroy had changed the curriculum and that anatomy lab absences not allowed without an excused absence.

88. On information and belief, this is the first time such a change had occurred.

89. On information and belief, the modification was made for the sole purpose of blocking Dr. Saxena from completing the anatomy course work.

90. For example, UMMS would either force him into the unsafe environment, or, if he missed the lab, it would trigger an automatic failure and he would be unable to complete his second year of medical school.

91. UMMS attempted to make an accommodation where Dr. Saxena did not have to physically perform the dissection and could just observe standing away from the dissection table.

92. However, the accommodation was unreasonable because Dr. Saxena would still be required to be in the lab and be exposed to formaldehyde.

93. UMMS waited until the very last moment to present this new 'accommodation' two days before anatomy lab was to begin, insisting it could only be presented in a face to face meeting.

94. Dr. Saxena asked that since he was no longer required to do the dissection, would he be allowed to just watch via video link.

95. This reasonable request was denied, and he was told to go back to the accommodations committee.

96. Dr. Jonassen's response to his request stressed that the reason for Dr. Saxena to be in the laboratory was to interact with the students and that this was a new

component of the curriculum, further highlighting how UMMS had adversely modified its curriculum in retaliation for Dr. Saxena's ongoing quest for a reasonable accommodation.

97. However, on information and belief, another student was given an accommodation to enter the lab after hours when no one else was present.

98. At that time, it was reiterated by Dr. Jonassen that Dr. Saxena would watch from inside the lab in a hazmat suit. Again, it is next to impossible to communicate with people when one is in a hazmat suit.

99. Dr. Saxena's doctors advised against it.

100. Furthermore, the hazmat suit hinders learning and it garners attention/ridicule.

101. About late October, 2015 a decision was sent to Dr. Saxena informing him that a progress board had been convened and it was recommended that he be stopped from continuing in year two of medical school.

102. In the previous year, no such committee had been convened to discuss him being allowed to continue.

103. Once again, UMMS modified its curriculum so that Dr. Saxena would not be able to complete year two.

104. During the fall term, Dr. Saxena repeatedly raised concerns with Dr. Chimienti that all the hearings and meetings were being conducted in the most inopportune times, interfering with classes and during exam times.

105. Further, letters were being sent to him about crucial matters regarding his request for an accommodation with the dates not being correct and actions were being taken very slowly.

106. In communications from Dr. Chimienti, Dr. Saxena was repeatedly being reminded that he should complete medical school in no longer than 6 years (even though this deadline can be extended at the school's discretion). It seemed that the school was stretching/delaying the time by not giving him an accommodation so that Dr. Saxena would simply give up his quest for a reasonable accommodation so that he can complete medical school.

107. Dr. Jerry Durbin ("Dr. Durbin"), Dr. Saxena's new advisor, informed him that he had met with Deans Sonia Chimienti, Melissa Fischer, ("Dr. Fisher") along with Dr. Ennis and Dr. Hatem.

108. Dr. Durbin was harsh and aggressive. Dr. Saxena had not given Dr. Durbin permission to speak about this matter to anyone and yet Dr. Saxena's medical

condition and accommodations were being freely discussed without his consent. Dr. Saxena had been repeatedly told by Dr. Chimienti (and earlier by Dr. Kneeland) that they are not allowed to speak about his medical condition in order to "protect" his privacy. However, meetings were being held where his condition was being discussed among various senior faculty.

109. Dr. Durbin also said that Dr. Saxena was naïve if he believed what the School had told him in writing that his advisor had been changed (solely) because of the threats that the former advisor made.

110. Around early November 2015 Dr. Saxena met again with Sonia Chimienti, and she asked him to look for other schools that will allow him to take anatomy without formaldehyde cadavers and/or wholly transfer out of the school.

111. At this meeting, she further stated that the same committee (to which Dr. Saxena had met with in July) would then make a recommendation to the Dean of UMMS to allow Dr. Saxena to transfer this credit.

112. Dr. Saxena felt that he should have been presented with this option a year sooner and that the school should have spearheaded finding another school. Second year of medical school is very burdensome and asking a student to not only take on additional coursework but then to also take on the burden of finding another school for alternate coursework is doubly burdensome.

113. Now, during the course of his second year of medical school, Dr. Saxena was required to spend valuable time and look at hundreds of schools to see if some other school could help him.

114. This task was almost impossible and was nothing more than a continuation of the School's efforts to deny him an accommodation and to stretch/delay time so that he would be unable to complete medical school.

115. Further, the School had instructed him to complete his anatomy coursework during the course of second year while they made no effort to figure out a way for him to complete this coursework during the prior summer.

116. In short, the School was telling him that rather than finding a way to help him, it would be better if he just left. At this meeting with Dr. Chimienti, Dr. Saxena asked if he could meet with a different member of the accommodations committee.

117. This request was subsequently denied via email.

118. On December 16, 2015 (between two final exams) Dr. Saxena had another hearing because no safe accommodation had yet been made, and he was still unable to complete anatomy.

119. At the hearing, UMMS asked whether he had found other schools to transfer to in order to take anatomy elsewhere proving that the school had no intention to help him with an accommodation.

120. In January 2016, about a month before classes were to end, Dr. Saxena was told that he would not be allowed to continue on with the rest of his 2nd year even though he was completing all his coursework up until then. Most medical schools, as he later learned, will not allow transfers if a student has not completed second year. Thus, Dr. Chimienti's offer to transfer from the school was not made in good faith.

121. Dr. Saxena met with Dr. Chimienti on January 7, 2016. She repeated the suggestion for him to take anatomy in a different school. She emailed him about taking anatomy coursework at Columbia University School of Medicine and she also suggested The University of Connecticut and The University of North Dakota and she again asked him to reach out to several hundred schools.

122. Dr. Saxena reached out to Dr. Paulette Bernd  ("Dr. Bernd") at Columbia University who kindly responded that they had a similar student with formaldehyde reactivity and that Columbia University arranged for that student to take anatomy using plastinated models at NYU School of Dentistry.

123. On January 14. 2016, Dr. Saxena met with the Dean of UMMS, Terence Flotte ("Dr. Flotte") to appeal the decision of not being allowed to complete second year.  Dr. Flotte started the conversation by asking, "Is your goal to graduate with an MD?"  He told Dr. Saxena to do as he was told. He was very aggressive and threatening. The Dean acknowledged that he had been in touch with the various players, including members of the Accommodation Committee.

124. Dr. Saxena was charged for tuition for the time in January before he was instructed to stop with the second year. This also highlighted the retaliatory nature of the whole process. In December 2015, he had been forced to attend a meeting between exams and when he protested, he was told that this was necessary so that the school could make a decision about his status before the next term began.  Yet he was still charged for class time in January.

125. Finally, after months of searching, Dr. Saxena heard from Dr. Robert Spears ("Dr. Spears"), the Dean of Student Affairs at the University of Texas School of Dentistry, that he would personally supervise his anatomy learning and in fact will do it following the curriculum at UMMS (July 22, 2016).

126. This was communicated to Dr. Chimienti on July 29, 2016.  On August 6, 2018, over a week later, she finally responded, after she was sent a reminder.

127. UMMS through Dr. Chimienti, had itself earlier in 2015 and in January 2016 suggested this course of action (to find a school to take anatomy and also to find schools to transfer wholly to). Dr. Chimienti had told Dr. Saxena in those earlier meetings that after he finds a school where he can take anatomy, he could present this to the progress board committee (the one he had met with in July 2015 and in December 2015) and the committee could then recommend this transfer of anatomy coursework to the dean of UMMS. Also, she had at those meetings told him that she would approach Melissa Fischer (one of the Deans) with Dr. Saxena to help him obtain this transfer credit. Dr. Saxena had repeatedly told Dr. Chimienti in those earlier meetings that the accommodations committee was not working to safeguard his health and he had also communicated this at his committee hearing in late July 2015. These options (to find other schools where anatomy could be taken or the option to transfer completely out of UMMS) were thus presented by Dr. Chimienti in lieu of having the accommodations committee continue to insist that he enter the laboratory back in 2015 and in early 2016.

128. However, at this point in August 2016 in her email reply, Dr. Chimienti told Dr. Saxena to go to the accommodations committee for approval.

129. At this point, it was abundantly clear that no matter what Dr. Saxena did, UMMS was going to block his ability to complete the required anatomy coursework.

130. On or about August 12, 2016, Dr. Saxena attempted twice to meet with Dr. Fischer, the Dean that Sonia Chimienti had said would help him transfer anatomy credit, and he was again told to go back to the Accommodations Committee. She also did not meet with him.

131. Dr. Saxena then asked Dr. Chimienti if he could meet again with the Progress Board Committee. He was told that it wasn't possible and he was again directed to go to the Accommodations Committee.

132. Dr. Saxena then requested that all the doctors that had evaluated him to send their evaluations directly to the Accommodations Committee along with an evaluation from Dr. Scott Harris outlining his need for an accommodation. Dr. Saxena also sent them the offer from Dr. Robert Spears, Dean at the University of Texas who had agreed to supervise his anatomy coursework. In having the physicians directly send their letters to the accommodations office, Dr. Saxena had now fulfilled all of UMMS' requests except to provide written permission to speak to his physicians outside of his presence, as this was a violation of his privacy and unnecessary for the purpose of finding an accommodation.

133. On December 9, 2016, Dr. Saxena faxed a request to UMMS again asking for an accommodation. It also mentioned the offer from Dr. Spears to help him complete a tailor-made course in anatomy following the medical school's curriculum at UMMS.

134. On or about Jan 6, 2017 UMMS' response did not acknowledge this plan for taking anatomy, contained misstatements, asked for even more documentation and said that they do not accept faxed letters from students. UMMS made this representation about faxed letters from students despite knowing that the faxes had also been sent directly from the physicians' offices (physical letters were also requested and sent directly by the physicians). This further highlights that UMMS has not worked in good faith.

135. On Jan 23, 2017, Dr. Saxena's attorney sent UMMS an appeal letter requesting that he be granted a reasonable accommodation.

136. On or about Feb 10, 2017, UMMS communicated via an email through its attorney James Healy that an appeal was not needed and no mention was again made of the anatomy coursework at the University of Texas that UMMS had itself suggested he pursue.

137. On or about Feb 10, 2017, Dr. Saxena's attorney responded requesting that he be provided an accommodation and that UMMS' insistence that he enter the laboratory in a hazmat suit would not work and that its own suggestion of taking anatomy elsewhere was now available at the University of Texas and he should be allowed to undertake this coursework.

138. On or about February 14, 2017, UMMS responded via its attorney, James Healy, and it still did not acknowledge the University of Texas offer for Dr. Saxena to complete his anatomy coursework.

139. Dr. Saxena's attorney then asked UMMS to submit its requests and questions for Dr. Saxena's physicians in writing so that his physicians could provide answers. This should have met all of UMMS' requirements and had UMMS' possible concerns rested on solid grounds, they would have been willing to put in writing what further information they possibly needed from his physicians.

140. UMMS rejected this and demanded that he surrender his medical privacy and permit the Academic Accommodations committee to communicate directly with his physicians.

141. In doing so, UMMS discriminated against him on the basis of his disability. It violated his civil rights and his right to privacy. This request further added to the requirements needed to grant him an accommodation. UMMS had no intention of granting him an accommodation.

142. . The School has repeatedly told Dr. Saxena that they would not engage in discussions with attorneys. However, the school itself has repeatedly communicated via its attorneys.

143. On or about March 15, 2017, via a letter, Dr. DeMarco presented the decision that the Accommodations Committee would not provide him with an accommodation. It still insisted on a hazmat suite when UMMS' offer to take anatomy elsewhere was readily available.

144. On March 24, 2017, an appeal was filed on the March 15, 2017 decision by the school.

145. The appeal was denied on April 11, 2017.

146. In December 2017, UMMS informed Dr. Saxena that he was reaching the maximum leave of absence allowed and that if he wished to extend the LOA, he would need to get permission from the school. This itself was counterintuitive as UMMS itself had forced Dr. Saxena to stop coursework and go on an LOA. This also showed that this deadline was arbitrary as it was within UMMS' discretion to extend it.

147. In January 2018, Dr. Saxena let UMMS (Sonia Chimienti) know that he wished to continue with medical school. In February 2018, Dr. Saxena met with Dr. Chimienti. Dr. Chimienti had earlier in late 2016 refused to meet with Dr. Saxena when he had secured the option to take anatomy at the University of Texas.

148. In this meeting Dr. Saxena mentioned to Dr. Chimienti that he would like to take up her offer and try to transfer wholly out of the school.

149. Hoping to transfer to another school, Dr. Saxena reached out to many schools. He has found that most schools will not accept transfer requests from students who haven't completed second year and haven't taken the USMLE (US medical licensing exam). Thus, UMMS' suggestion of a transfer was made in bad faith as they stopped him from completing second year a month before coursework was to end in Feb 2016. Even a school that accepts students into second year that was receptive to the possibility of a transfer seemed to change course after they communicated with Dr. Chimienti. Thus, UMMS was not only denying Dr. Saxena an accommodation, it was actively thwarting his ability to transfer. This shows UMMS' malign intent.

150. On information and belief, it is learned that it is relatively simple for UMMS to provide a frozen cadaver.

151. Further, when in 2018, Dr. Saxena reached out to UMMS to be granted an accommodation, UMMS now added on further conditions. UMMS further retaliated by changing the requirements for its accommodations process and asked Dr. Saxena to restart the whole accommodations process.

152. UMMS continues to thwart Dr. Saxena's ability to complete the required coursework.

153. UMMS has prevented him from continuing his medical education by failing to grant him a reasonable accommodation for this disability.

154. As a result, Dr. Saxena has lost almost 3 years of anticipated wages, which continue to grow as he is unemployable until he graduates.

155. Dr. Saxena has been further discriminated against for his age, and race/national origin.

156. Dr. Saxena has also had his HIPPA and privacy rights violated. The school has also violated his right to medical privacy and continues to do so.

157. As a result, Dr. Saxena has suffered significant emotional distress.

<u>Causes of Action</u>

(Each Cause Of Action Incorporates Therein
All Of The Paragraphs Set Forth, Hereinabove.)

<u>FIRST CAUSE OF ACTION – AGE DISCRIMINATION IN VIOLATION OF MASS.
GEN. LAWS CHAPTER 151B §1, et. seq.</u>

158. This is a cause of action against the Defendant for age discrimination in violation of Massachusetts General Laws Chapter 151B § 1, et. seq.

159. At the time of his enrollment, Plaintiff was 43 years old.

160. At all times, the Defendant's faculty and student body was aware that Plaintiff is over the age of 40 and significantly older than a typical medical student.

161. The Defendant knowingly and consciously permitted faculty and students to mock and bully Dr. Saxena on the basis of his age, which resulted in a hostile and abusive environment.

162. As a direct result, Plaintiff has suffered damages.

<u>SECOND CAUSE OF ACTION – RACE/NATIONAL ORIGIN DISCRIMINATION IN
VIOLATION OF MASS. GEN. LAWS CHAPTER 151B §1, et. seq.</u>

163. This is a cause of action against the Respondent for race and national origin
discrimination in violation of Massachusetts General Laws Chapter 151B § 1, et.
seq.

164. The Plaintiff is an Indian who was born in India.

165. The Defendant's faculty and student body is aware that Plaintiff is an Indian.

166. The Defendant knowingly and consciously permitted faculty and students to mock
and bully Dr. Saxena on the basis of his race and national origin, which resulted in
a hostile and abusive environment.

167. As a result of the Respondent's conduct, the Plaintiff has suffered damages.

<u>THIRD CAUSE OF ACTION – RETALIATION IN VIOLATION OF MASS. GEN.
LAWS CHAPTER 151B §1, et. seq.</u>

168. This is a cause of action against the Defendant for retaliation in violation of
Massachusetts General Laws Chapter 151B § 1, et seq.

169. As the result of complaining about the Defendant's unlawful age, race and
national origin discrimination, Defendant retaliated against the Plaintiff by using
his disability and need for a reasonable accommodation as an excuse to terminate
Plaintiff's relationship with the School.

170. As the result of complaining about the Defendant's unlawful age, race and
national origin discrimination, Defendant retaliated against the Plaintiff by not
giving him an accommodation and stalling to thwart his ability to finish medical
school.

171. As the result of complaining about the Respondent's unlawful race
discrimination, the Defendant retaliated against the Plaintiff by not allowing the
Plaintiff to continue his course of study.

172. As a result, the Plaintiff has suffered significant damages.

## FOURTH CAUSE OF ACTION – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990, PUB. L. NO. 101-336 §1, et. seq., 104 STAT.328 (1990)

173. This is a cause of action against the Defendant for disability discrimination in violation of the Americans with Disabilities Act of 1990, Pub. L. No. 101-336 sec. 1 et seq., 104 Stat. 328 (199).

174. The Plaintiff is a disabled individual.

175. At all relevant times, the Defendant was aware that Plaintiff is a disabled individual.

176. The Defendant refused to engage in the interactive process with Plaintiff.

177. The Defendant refused to provide the Plaintiff with a reasonable accommodation.

178. As a direct result, the Plaintiff has been unable to complete medical school.

179. As a direct result, the Plaintiff is unable to transfer to another medical school

180. As a direct result, the Plaintiff has suffered significant damages.

## FIFTH CAUSE OF ACTION – RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990, PUB. L. NO. 101-336 §1, et. seq., 104 STAT.328 (1990)

181. This is a cause of action against the Defendant for retaliation in violation of the Americans with Disabilities Act of 1990, Pub. L. No. 101-336 sec. 1 et seq., 104 Stat. 328 (199).

182. The Plaintiff is a disabled individual.

183. At all relevant times, the Defendant was aware that Plaintiff is a disabled individual.

184. As the result of Plaintiff needing an accommodation, requesting an accommodation and/or attempting to engage in the interactive process, the Defendant retaliated against Plaintiff.

185. The Defendant retaliated by changing its requirements for an accommodation each time Plaintiff asked for an accommodation, holding Plaintiff to higher standards than his fellow students, requiring Plaintiff to waive his HIPPA rights in order to secure an accommodation and by breaching Plaintiff's privacy.

186. The Defendant retaliated by acting to deliberately interfere with Plaintiff's ability to complete medical school at UMMS and at other medical schools across America.

187. As a result, Plaintiff has suffered damages.

SIXTH CAUSE OF ACTION – VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973 34 C.F.R. PART 104.4

188. This is a cause of action against the Defendant for disability discrimination in violation of Section 504 the Rehabilitation Act of 1973; C.F.R. Part 104.4.

189. The Plaintiff is a disabled individual.

190. At all relevant times, the Defendant was aware that Plaintiff is a disabled individual.

191. The Defendant refused to engage in the interactive process with Plaintiff.

192. The Defendant refused to provide the Plaintiff with a reasonable accommodation.

193. As a direct result, the Plaintiff has been unable to complete medical school.

194. As a direct result, the Plaintiff is unable to transfer to another medical school

195. As a direct result, the Plaintiff has suffered significant damages.

SEVENTH CAUSE OF ACTION – RETALIATION IN VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973 34 C.F.R. PART 104.4

196. This is a cause of action against the Defendant for retaliation in violation of Section 504 the Rehabilitation Act of 1973; C.F.R. Part 104.4.

197. The Plaintiff is a disabled individual.

198. At all relevant times, the Defendant was aware that Plaintiff is a disabled individual.

199. As the result of Plaintiff needing an accommodation, requesting an accommodation and/or attempting to engage in the interactive process, the Defendant retaliated against Plaintiff.

200. The Defendant retaliated by changing its requirements for an accommodation each time Plaintiff asked for an accommodation, holding Plaintiff to higher standards than his fellow students, requiring Plaintiff to waive his HIPPA rights in order to secure an accommodation and by breaching Plaintiff's privacy.

201. The Defendant retaliated by acting to deliberately interfere with Plaintiff's ability to complete medical school at UMMS and at other medical schools across America.

202. As a result, Plaintiff has suffered damages.

## EIGTH CAUSE OF ACTION – RETALIATION IN VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973 34 C.F.R. PART 104.4

203. This is a cause of action against the Defendant for invasion of privacy.

204. A person shall have a right against unreasonable, substantial or serious interference with his privacy.

205. The Defendant interfered with Dr. Saxena's privacy by discussing confidential health matters among its agents without Dr. Saxena's knowledge or permission.

206. The Defendants interfered with Dr. Saxena's right against unreasonable, substantial and/or serious interference with his privacy when he was required to waive his HIPPA rights and/or when he was required to permit Defendant to speak freely with any and all of his physicians in order to attain a reasonable accommodation.

207. The Defendants interfered with Dr. Saxena's right against unreasonable, substantial and/or serious interference with his privacy when he was required to waive his HIPPA rights and/or when he was required to permit Defendant to speak freely with any and all of his physicians, outside of Dr. Saxena's presence, in order to attain a reasonable accommodation.

208. As a result of the Defendant's conduct, Plaintiff has suffered damages.

*The Plaintiff demands a jury trial on all triable issues.*

WHEREFORE, the Plaintiff hereby requests that this Honorable Court grant the following relief:

1. Judgment against the Defendant;

2. Attorney's fees, costs and expert witness fees;

3. Compensatory damages for emotional distress;

4. Punitive damages pursuant to MGL c. 151B, § 9;

5. Pre-Judgment and Post-Judgment Interest, and

6. Such other relief as the Court deems just and fair.

7. Plaintiff be given the accommodation he needs to complete medical school.


May 15, 2019                              The Plaintiff,
                                          Dr. Vishal Saxena,
                                          By his attorney,


                                          _____
                                          Suzanne L. Herold (BBO# 675808)
                                          Herold Law Group, P.C.
                                          50 Terminal Street
                                          Building 2, Suite 716
                                          Charlestown, MA 02129
                                          (617) 336-7196 (t)
                                          (617) 398-2730 (f)
                                          suzie@heroldlawgroup.com