UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                                       |   |                          |
|---------------------------------------|---|--------------------------|
| DR. VISHAL SAXENA,<br>　　Plaintiff,  | ) |                          |
| v.                                    | ) | CIVIL ACTION<br>No. 19-40007-TSH |
| UNIVERSITY OF MASSACHUSETS<br>MEDICAL SCHOOL,<br>　　Defendant. | ) |                          |

**Memorandum of Decision and Order**
March 2, 2020

**HILLMAN, D.J.**

**Background**

Dr. Vishal Saxena ("Plaintiff" or "Saxena") filed suit against University of Massachusetts Medical School ("Defendant" or "UMMS") alleging claims for: age discrimination under the Massachusetts Antidiscrimination Act, Mass. Gen.L. ch. 151B §1 *et seq.* ("Chapter 151B") (Count One); race/national origin discrimination in violation of Chapter 151B (Count Two); retaliation for reporting discrimination in violation of Chapter 151B (Count Three); violation of the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq.* ("ADA") (Count Four); retaliation in violation of the ADA (Count Five); violation of the Rehabilitation Act of 1973, § 504, 29 U.S.C. § 794 ("Rehabilitation Act")(Count Six); retaliation in violation of the Rehabilitation Act based on not granting Plaintiff an accommodation (Count Seven); and

retaliation in violation of the Rehabilitation Act based on Defendant's invasion of Plaintiff's privacy (Count Eight).

Plaintiffs' claims arise from a series of administrative decisions by UMMS regarding a potential accommodation for his formaldehyde sensitivity, and alleged harassment he suffered due to his age and/or national origin. This Memorandum of Decision and Order addresses Defendant's Motion To Dismiss (Docket No. 9) which seeks dismissal of Counts One, Two and Three. For the reasons set forth below, that motion is *granted.*

## **Standard of Review**

On a Rule 12(b)(6) motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the plaintiff must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (internal citations omitted). The standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if plaintiff's well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharm.*, LLC, 521 F.3d 76, 84 (1st Cir. 2008) (internal quotations and original alterations omitted). "The relevant inquiry focuses on the reasonableness of the

inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." *Ocasio-Hernàndez v. Fortuño-Burset,* 640 F.3d 1, 13 (1st Cir. 2011).

## **Facts**[1]

### Plaintiff Enrolls at UMMS

Plaintiff enrolled at UMMS, a public medical school, in or about August 2014. Plaintiff was born in India and at the time of his enrollment was over 40 years old. He had a well-documented sensitivity to formaldehyde. Formaldehyde is a carcinogen classified as a toxic, corrosive, and sensitizing chemical. Exposure to formaldehyde can cause the Plaintiff trouble with breathing, coughing, eye irritation, disorientation, and more. Formaldehyde is utilized to preserve cadavers that UMMS use in its anatomy lab.

### Plaintiff's Interactions with Faculty Members Regarding Incidents of Harassment and His Requests for Accommodations for his Formaldehyde Sensitivity

In early September 2014, Plaintiff met with his faculty advisor, Dr. Phil Fournier ("Dr. Fournier") and reported that other students were harassing him because of his age. According to Plaintiff, Dr. Fournier "responded by threatening Dr. Saxena about his vaccination status." Also, in late September 2014, Plaintiff met with Susan Gagliardi, UMMS Vice Chair of Medical Education, who acknowledged his concern about his severe reaction to formaldehyde and asked him to see a Student Health primary care physician, Dr. Joseph DiFranza. He was told that he would be evaluated, and Environmental Health and Safety would work directly with Student Health to implement whatever action is needed. Dr. DiFranza concluded that Plaintiff should not

---

[1] On a motion to dismiss, the Court must treat the factual allegations asserted therein as true, even if seemingly incredible. *See Ocasio-Hernandezt*, 640 F.3d at 12. However, the Court is to disregard legal conclusions masquerading as facts, as well as factual allegation which, "while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory and the factual." *Id.* (citing *Penalbert-Rosa v. Fortuno-Burset*, 631 F.3d 592, 595 (1st Cir. 2011)). In this case, Plaintiff's factual assertions are replete with legal conclusions, irrelevant matters and improper commentary all of which have been ignored by the Court.

go into the anatomy lab due to the risk of formaldehyde exposure. Plaintiff was informed by Student Health Services that he was to be fitted with a respirator despite (Dr. DiFranza's conclusion that he not enter the lab even with a respirator). Plaintiff was also asked to provide letters from a physician regarding his sensitivity to formaldehyde.

On October 3, 2014, Plaintiff again met with Dr. Fournier who continued to threaten him about vaccines. Dr. Fournier also indicated that his course of study could be delayed to five or more years, told him "I'm sure you are in good health" and that "this is a small UMMS" so Plaintiff "should not make trouble because things get around." Also, in early October, Plaintiff met with the Chair of the Academic Accommodations Committee, Deborah Harmon-Hines, ("Harmon-Hines") to discuss potential formaldehyde accommodations. Plaintiff alleges Harmon-Hines was "very hostile" and "mentioned Plaintiff's Indian origin for no attributable reason." Harmon-Hines informed Plaintiff, in response to his stating that the process was taking too long, that his course of study may be delayed to five or more years. Harmon-Hines offered Plaintiff the accommodation of using a frozen cadaver. Plaintiff contacted Terence Flotte ("Flotte"), Dean of UMMS, and asked for a meeting to discuss his concerns as to how he was treated by Harmon-Hines. Flotte refused to meet with him. Flotte instead directed Plaintiff to meet with Deborah DeMarco ("DeMarco"), Co-Chair of the ADA Accommodations Committee. When he met with DeMarco, she "refused" to accept his written note from a primary care physician and instead asked for written documentation from specialists.

Around that same time, Plaintiff spoke with his Anatomy Professor, Dr. Anne Gilroy, ("Dr. Gilroy") who informed him that "UMMS only accepts evaluations from American physicians…." Plaintiff further alleges that Dr. Gilroy told him to "do as he was told," that he was "choosing to make trouble for the school," and that he should "leave the school" and "go

4

get a job." Plaintiff felt these comments were aimed at both his age and national origin. In November 2014, Plaintiff met with the Associate Dean of Student Affairs, Dr. Michael Kneeland ("Dr. Kneeland"). Plaintiff alleges Dr. Kneeland "asked where [he] is from." Plaintiff believes he was referring to his national origin.

Throughout his first semester, Plaintiff and UMMS worked together to find a reasonable accommodation to permit him to safely enter the anatomy lab. UMMS initially suggested a respirator, but eventually offered Plaintiff a full hazmat suit for protective wear. UMMS also offered Plaintiff to perform part of the lab work outside the anatomy lab (*i.e.*, Plaintiff could dissect a cow's heart in a different lab). Plaintiff believed, however, that he would still have to complete the remainder of the lab work in an area where he would be exposed to formaldehyde. Plaintiff feared the hazmat suit would not adequately protect him. For that and a litany of other reasons, he also rejected that accommodation. UMMS also suggested a frozen cadaver alternative, or the possibility of Plaintiff taking anatomy at a different location or transferring out entirely. When these options were presented, Plaintiff felt they were unreasonable. However, Plaintiff eventually concluded that the most reasonable accommodation would be to permit him to use a frozen cadaver. When UMMS and Plaintiff had not agreed to a reasonable accommodation by February 2015, Plaintiff was forced to drop anatomy.

In the summer of 2015, Plaintiff "raised concerns" with the new Associate Dean of Student Affairs, Dr. Sonia Chimienti ("Dr. Chimienti"), about "harassment by students at the school where his age and national origin/race seemed to be underlying issues." He mentioned that he had previously raised these concerns with Dr. Fournier in September 2014. Plaintiff asserts that he sent an email to Dr. Chimienti at the end of August 2015 "mentioning that he still

felt threatened…." Dr. Chimienti suggested that Plaintiff submit his complaints against Dr. Fournier in writing.

In July 2015, UMMS held a committee meeting dealing with Plaintiff's medical need for an accommodation and possibility of providing him with a frozen cadaver. In August 2015, the results of the committee meeting were communicated to Plaintiff and he received written notification in September: Plaintiff's accommodation would be worked out with the anatomy instructors with input, as needed, from the accommodations office.

Sometime in August 2015, Plaintiff met with Dr. David Hatem and Dr. Michael Ennis. Plaintiff explained to them that "several students had been harassing him based on his age and national origin" and that he had previously mentioned this to Dr. Fournier. After this meeting Dr. Fournier admitted that he had threatened Plaintiff and Plaintiff was ultimately assigned a new advisor, Dr. Durbin. Plaintiff found Dr. Durbin to be "harsh and aggressive." Plaintiff continued to work with UMMS for an accommodation for his formaldehyde sensitivity but stopped raising discrimination issues with faculty and staff.[2]

In September 2015, students were notified that Dr. Gilroy had changed the curriculum and that missing anatomy lab would not be allowed without an excused absence. Plaintiff felt that this modification would either force him to enter the lab where he would be exposed to formaldehyde or fail the class. Immediately before anatomy class was to commence, UMMS offered Plaintiff a new accommodation-- he could wear a hazmat suit while standing away from the dissecting table and observe the dissection without taking part He rejected this

---

[2] Plaintiff asserted that at this time, he continued to "face a threatening environment" and that he was "physically abused" by a senior instructor under the supervision of Dr. Fournier. He suggests that other students were privy to his medical history and disability based on their remarking "aha I think I saw something," during clinical skill session—he attributes such remarks to conditions "inferred by Harmon-Hines."

accommodation because he believed he would still be exposed to formaldehyde. His request to instead observe the dissection via a video link from outside the lab room was denied.

In late October 2015, a decision was sent to Plaintiff informing him that a progress board had been convened which recommended that he be stopped from completing his second year of medical school. At the same time, Dr. Chimienti also reminded him that he should complete medical school in no longer than six years. In a subsequent discussion, Dr. Chimienti suggested that he should look to transfer to other schools that do not use formaldehyde preserved cadavers (the school would transfer this credit) or to wholly transfer out of the school. UMMS left it to Plaintiff to find an alternative school to take the course.

In January 2016, Plaintiff was informed that he would not be allowed to continue with his second year of medical school even though he was completing all his coursework. It is difficult to transfer to another school if you don't complete your second year. Also, at this time, Dr. Chimienti recommended three schools that Plaintiff should reach out to regarding taking an anatomy class and "again asked him to reach out to several hundred schools." Plaintiff was charged for class time in January even though he was told he would not be permitted to complete his second year.

In July 2016, a Dr. Robert Spears, Dean of Student Affairs at the University of Texas School of Dentistry, agreed with the Plaintiff that he would personally supervise his anatomy instruction using UMMS's curriculum. Plaintiff notified Dr. Chimienti of this arrangement on July 29, 2016. About a week later, Dr. Chimienti told him to take his request to the Accommodation Committee for approval. Plaintiff instead wanted to meet with the Progress Board Committee, but that request was rejected. On December 9, 2016, Plaintiff sent his request with Dr. Spear's proposal to the Accommodation Committee and included evaluations by his

7

doctors/specialists.  On January 6, 2017, UMMS informed Plaintiff that his documentation was not adequate because it included faxed letters and the committee only accepts physical letters. On January 23, 2017, Plaintiff's lawyer sent UMMS an appeal letter requesting he be provided reasonable accommodations.  After a series of back and forth correspondence UMMS's lawyer informed Plaintiff in February 2017 that the school did not "acknowledge" Dr. Spear's request. One of the primary issues was that the committee wanted Plaintiff to sign a release permitting them to communicate directly with his physicians. Plaintiff declined and instead, wanted the committee to submit questions and requests to his lawyer to be forwarded to the physicians.

On March 15, 2017, the Accommodations Committee rejected Plaintiff's request that he be permitted to take an anatomy class with Dr. Spears and the committee continued to suggest that he use a hazmat suit. On March 24th Plaintiff appealed that decision, which UMMS denied on April 11, 2017. Exactly 300 days later, on February 5th, 2018, Plaintiff filed a complaint against UMMS with the Massachusetts Commission Against Discrimination ("MCAD").

## **Discussion**

UMMS seeks to dismiss Counts One (UMMS knowingly and consciously permitted faculty and students to mock and bully Plaintiff based on his age), and  Two (UMMS permitted faculty and students to mock Plaintiff based on his national origin) of Plaintiff's amended complaint on the grounds that they are barred by the applicable statute of limitations.  UMMS seeks to dismiss Count Three (retaliation for his complaints of age and national origin discrimination) on the grounds that Plaintiff's allegations fail to make out a prima facie case of retaliation.

## Whether Plaintiff's Claims for Age, National Origin and Race Discrimination are Time-Barred
## (Counts One and Two)

Under Massachusetts law, employees must file their discrimination claims with the MCAD within 300 days of the alleged discriminatory acts. Mass.Gen.L. ch. 151B, § 5. The "failure to file a timely charge of discrimination with the MCAD (or EEOC) requires the dismissal of any subsequent lawsuit." *Buntin v. City of Boston*, 2015 WL 2165938, *2 (D. Mass. May 8, 2015) (reversed in part on other grounds by *Buntin v. City of Boston*, 813 F.3d 401 (1st Cir. 2015)). Acts beyond this 300-day limit are timely only if either (1) they are substantially related to an otherwise timely "anchoring" event, or (2) they are part of a "continuing violation." *See Cuddyer v Stop & Shop Supermarket Company*, 434 Mass. 521, 750 N.E.2d 928 (2001). Here, Plaintiff filed his complaint with the MCAD on February 5, 2018 and therefore, can sue only as to those alleged discriminatory incidents which occurred after April 11, 2017.

Plaintiff has not alleged a single incident of age or national origin discrimination occurring within the limitations period. He argues that the 2014 and 2015 discriminatory incidents are not time-barred because of the continuing violation doctrine. Specifically, Plaintiff claims UMMS denied his appeal due to his age, race, and national origin, and thus the appeal denial is an "anchoring" event which time-cures the otherwise time-barred acts. However, Plaintiff has failed to tie *any* incidents of age, race or national origin discrimination (the last of which according to his complaint occurred in 2014-15) to any of these "anchoring events." [3]

---

[3] Although it is not necessary for me to address the merits of Plaintiff's age/national origin discrimination claims, that there is not a single fact alleged in the amended complaint that would support a claim for age/national origin discrimination underscores the futility of Plaintiff's attempt to argue the continuing violation doctrine. More specifically, Plaintiff's discrimination claims are based almost solely on conclusory legal allegations to wit: fellow students harassed him due to his age and national origin and that he reported these unspecified harassing incidents to UMMS faculty and administrators. The few specific examples of alleged discriminatory statements/incidents cited in the amended complaint are on their face innocuous and free of discriminatory animus yet are characterized by Plaintiff as disparaging him as the result of his age and/or national origin. As noted above, legal conclusion and improper commentary are not sufficient to support a plausible claim under *Iqbal and Twombly*.

Therefore, UMMS's motion to dismiss Counts One and Two on the grounds that they are time-barred is granted, with prejudice.

<u>Whether Plaintiff stated a Claim for Rehabilitation based on his complaints (Count Three)</u>

It is a violation of Chapter 151B for "any person to coerce, intimidate, threaten or interfere with another person in the exercise or enjoyment of any right granted or protected [thereby]." Mass.Gen.L. ch. 151B §4 (4A). Retaliation claims based on circumstantial evidence, such as the Plaintiff's, are evaluated under the familiar burden-shifting framework set forth in *McDonell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973); s*ee also Knight v. Avon Products, Inc.,* 438 Mass. 413, 420, 780 N.E.2d 1255 (2003) (noting Supreme Judicial Court's adoption of *McDonnell Douglass* framework "as an aid to the resolution of claims of employment discrimination under [Chapter151B]" (citation omitted)). To state a prima facie case for retaliation under Chapter 151B, a plaintiff must demonstrate that: (1) he engaged in protected conduct; (2) he suffered an adverse action; and (3) there is a causal connection between the two. *Ponte v. Steelcase, Inc.*, 741 F.3d 310, 321 (1st Cir. 2014); *see also Mole v. University of Massachusetts*, 442 Mass. 582, 591-92, 814 N.E.2d 329 (2004). Ultimately, Plaintiff must prove that the protected conduct was the "determinative cause" for the adverse action, *Lipchitz v. Raytheon Company*, 434 Mass. 493, 504, 751 N.E.2d 360 (2001), that is, the adverse actin would not have occurred in the absence of the protected activity. *See Soni v. Wespiser,* 404 F. Supp. 3d 323, 332–33 (D. Mass. 2019).

Both sides agree that for purposes of Defendant's motion, Plaintiff has met the first two elements for stating a prima facie case, *i.e.*., he engaged in protected conduct (complaints to school officials about age and national origin discrimination) and suffered an adverse action. They vehemently disagree as to whether Plaintiff has met the nexus element. I agree with

UMMS that to satisfy this element, "Plaintiff must plausibly show that his 'complaining about the Defendant's unlawful age, race and national origin discrimination,' was the 'determinative cause' of [UMMS] terminating its relationship with Plaintiff, not giving him an accommodation and "stalling to thwart his ability to finish medical school[,] and 'not allowing the Plaintiff to continue to his course of study.'" *Def's Mem. Of L. In Supp. Of Part. Mot. To Dismiss Counts 1,2 and 3 of Pl's First Amended Complaint* (Docket No. 10), at p. 6 (citations to complaint omitted).

First, there is a temporal disconnect between the last complaints raised by Plaintiff and the alleged adverse actions. While "[t]emporal proximity can create an inference of causation," … 'the inference of a causal connection becomes tenuous with the passage of time.'" *Soni*, 404 F.Supp. 3d at 332 (citation to quoted case omitted); *see also Noviello v. City of Boston,* 398 F.3d 76, 86 (1st Cir. 2005) (noting where adverse employment action "follows hard on the heels of protected activity, the timing often is strongly suggestive of retaliation") *but see Mesnick v. General Elec. Co.,* 950 F.2d 816, 828 (1st Cir. 1991) (holding that nine month period between protected conduct and alleged retaliation undermined inference of causation); *Calero-Cerezo v. U.S. Dept. of Justice,* 355 F.3d 6, 25 (1st Cir. 2004) (noting that "three and four month periods have been held insufficient to establish a causal connection based on temporal proximity").

In this case, the alleged adverse actions cited by Plaintiff occurred well after the Plaintiff reported the alleged incidents of discrimination to UMMS faculty and/or administration members. The First Circuit has made clear that temporal proximity 'is merely one factor relevant to causation.' *Garayalde-Rijos v. Municipality of Carolina*, 747 F.3d 15, 25 (1st Cir. 2014). So long as the plaintiff can link the adverse action to the protected activity sufficient to create an inference to support a causal connection, the passage of time in and of itself is not fatal to his or

her retaliation claim. *See Sonia*, 404 F.Supp.3d at 332 and cases cited therein. For example, "a plaintiff can still succeed on a retaliation claim despite a lack of proximity if the record supports 'a pattern of antagonism in the intervening period.'" *Id.*, at 333( quoting *Jensen v. Potter*, 435 F.3d 444, 450 (3ᵈ Cir. 2006), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405 (2006)) (noting that a pattern of antagonism in the intervening period can support a retaliation claim in the absence of temporal proximity)).

Here, the Plaintiff has failed to allege any facts which would establish the necessary link between antagonism based on his complaints related to his age and national origin, and the alleged adverse actions. As stated previously, Plaintiff's allegations in support of his age and national origin discrimination claims are based on legal conclusions and rank speculation (based on his perceptions). His allegations regarding alleged retaliation by UMMS are likewise based on legal conclusions and his interpretation of otherwise innocuous statements and actions. Accordingly, I find that he has failed to state a plausible claim for retaliation under Chapter 151B based on his age, race or national origin. Therefore, Count Three is dismissed.

## Conclusion

Defendant's Motion To Dismiss (Docket No. 9) is **_granted_** Counts One, Two and Three of the Amended Complaint are hereby dismissed.

          */s/ Timothy S. Hillman*
          TIMOTHY S. HILLMAN
          DISTRICT JUDGE