FILED
IN CLERKS OFFICE

2023 MAY 17 PM 12: 28

U.S. DISTRICT COURT

**UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

CIVIL ACTION NO. 4:19-CV-40007-TSH

VISHAL SAXENA, Ph.D.,
   Plaintiff,

   v.

UNIVERSITY OF MASSACHUSETTS
MEDICAL SCHOOL,
   Defendant.

**MOTION FOR THE REASSIGNMENT OF CASE TO A DIFFERENT DISTRICT JUDGE**

Dr. Vishal Saxena (Plaintiff-Appellant, Appellant or Dr. Saxena) in the above named action hereby respectfully requests the honorable first circuit, following disposition of this interlocutory appeal, to order the reassignment of the above case to a different district court judge on remand. Dr. Saxena notes that he has previously in 2021 filed various complaints with external agencies about the bias in the court and the way the litigation has proceeded.

**INTRODUCTION AND CONTEXT**

Even though the bias in the court is collateral to the matter of the case, a relatively brief outline is presented of the case to contextualize some of the ways in which the bias in the court has shown itself. It is also presented to show the several misstatements and lies that underlie the way UMass has handled this matter and that UMass has not taken the matter of accommodations seriously. The bias in the court has allowed such patterns to continue during the litigation with the court also not taking this matter seriously.

Dr. Saxena started medical school at the University of Massachusetts (UMass) in Worcester in August 2014. While previously a student at Boston University School of Medicine (BU) (where he matriculated in 2011 and ultimately left for family health reasons), Dr. Saxena had severe allergic reactions to formaldehyde (affecting his breathing--including shortness of breath, cough; his vision--including severe decline in vision, double vision, and eye irritation; and his thinking--including brief loss of consciousness, difficulty concentrating), the chemical used to preserve cadavers in anatomy laboratory. Dr. Saxena informed UMass shortly after he started at UMass in 2014 and before anatomy lab was to start about these reactions and asked for help.

UMass asked Dr. Saxena to meet with one of its physicians, Dr. Joseph DiFranza (Dr. DiFranza) and be evaluated. Dr. Saxena related to Dr. DiFranza that even with the use of respirators (half face and full face) at BU he wasn't able to get relief from the severe reactions. Dr. DiFranza told Dr. Saxena that he was surprised that even in 2014 schools were still using this harmful and toxic chemical in anatomy laboratory. He asked if there were alternate ways to learn anatomy and Dr. Saxena informed him that there were several alternate ways to learn anatomy. Dr. DiFranza said that his recommendation is that given the severe reactions that Dr. Saxena had suffered that he not enter the lab and that alternate ways to teach anatomy be provided.

In spite of these recommendations by their own physician, UMass (via Ms. Debra Campbell, from the environmental health and safety office, who was brought in by Dr. Susan Gagliardi, one of the deans) then asked Dr. Saxena to put on a respirator. Dr. Saxena described that a respirator had already been tried at BU and had not worked and that their own doctor, Dr. DiFranza had told him not to enter the lab.

UMass (Dr. Gagliardi) then told Dr. Saxena to visit with the accommodations office. Dr. Saxena obtained a letter from a physician, Dr. Michael Reyes, stating that he had had severe reactions to formaldehyde (**Exhibit A**). At the accommodations office, Dr. Deborah Harmon-Hines, the chair of the accommodations committee, told Dr. Saxena that they would provide him with a frozen cadaver which Dr. Saxena readily accepted. However, the next accommodations officer, Dr. Deborah DeMarco, co-chair of the accommodations office, told Dr. Saxena that they would provide him with a respirator along with a hazmat suit. Over several email exchanges, Dr. Saxena interactively informed the accommodations office (Dr. DeMarco) that he had already tried respirators and they had not worked. He also told her that he had used the respirators correctly. She told him that she didn't think his reactions were life threatening and Dr. Saxena reaffirmed for her that indeed the reactions were life threatening.

Both accommodations officers refused the letter from Dr. Reyes and asked for a specialist evaluation in writing in October 2014. The accommodations office via Dr. DeMarco insisted that they would only consider an alternate method such as a frozen cadaver if Dr. Saxena put on a hazmat suit with a respirator to see if he would suffer any reactions. Dr. Saxena told the office that trying out something hazardous to his health seems to not make sense.

In internal emails exchanged between Dr. DeMarco, Dr. Gagliardi, and Dr. Harmon-Hines, it was mentioned that the frozen cadaver is a big deal (Gagliardi) and that they would only consider a frozen cadaver if the hazmat suit (with the respirator) fails (DeMarco). In other words, UMass seemed to acknowledge that the frozen cadaver is feasible but that they would only consider it if Dr. Saxena risked danger to his health to prove to UMass that indeed he suffered from reactions.

Dr. DeMarco also in the meantime during the interactive conversations in October 2014 told Dr.

Saxena that she had 'conferred' with Dr. DiFranza who had then told her that he never told Dr.

Saxena to not step foot in the lab and that it would be acceptable to him if Dr. Saxena were to

try out entering the lab. Dr. DeMarco also informed Dr. Saxena that Dr. DiFranza had told her

that they could not know what Dr. Saxena was allergic to. Internal communications from

discovery show that Dr. DiFranza never actually told Dr. DeMarco that he didn't know what Dr.

Saxena was allergic to and these internal communications along with Dr. DiFranza's clinical

notes (**Exhibit B**) show that his recommendations shifted from a position that corroborated what

he had told Dr. Saxena, viz that he not enter the lab to a position where he recommends Dr.

Saxena to enter the lab (**Exhibit C**). Whereas UMass in the past had used Dr. DiFranza's (later)

recommendations to enter the lab, now on March 16, 2023 in the hearing, UMass has shifted its

position, now saying that Dr. DiFranza is not a specialist.

They also now say that asking Dr. Saxena to obtain specialist letters was reasonable (in the

March 16, 2023 hearing). Although Dr. Saxena did obtain specialist letters, it is Dr. Saxena's

understanding that specialist letters are not required and UMass is using a very high bar and

has engaged in extensive analysis (see below where even in 2017, 3 years after the

accommodations process started and over 1 year after Dr. Saxena had been put on a forced

leave, UMass said that it is premature to provide Dr. Saxena an accommodation, because he

has yet to prove his disability--and this was after Umass had been given 5 doctors' evaluations,

one of which was a discharge note from the ER). See below and **Exhibit D at 4**.

Previous (before Dr. Saxena was asked to visit with the accommodations office) Internal emails

between Dr. Gagliardi and Dr. DiFranza also show that she suggested to Dr. DiFranza that

perhaps the 'head-gear' at BU might have been different from UMass and that the ventilation

system at UMass might have been different. The environmental safety officer (Ms. Debra

Campbell) was also in communication with Dr. DiFranza at Dr. Gagliardi's suggestion also prompting him to let Dr. Saxena enter the lab.

Over the next month (late October 2014, early November 2014), Dr. Saxena submitted two specialist letters, one from Dr. David Christiani at MGH, an occupational medicine doctor and a pulmonologist (**Exhibit** E), and another from Dr. Weihong Zheng, an allergist at Tufts Medical Center (**Exhibit** F).

Both letters asked UMass to allow Dr. Saxena to study anatomy in an alternate way without exposing Dr. Saxena to formaldehyde by allowing him to use frozen cadavers and/or by using virtual techniques.

UMass continued to insist on putting on a hazmat suit with a respirator in spite of both specialists saying that Dr. Saxena should avoid the formaldehyde environment altogether. UMass now asked Dr. Saxena to let them speak to his physicians. Seeing that UMass had not provided even a temporary accommodation that met the doctors' recommendations and seeing that UMass had misquoted Dr. DiFranza and given that UMass had asked for something in writing, Dr. Saxena resisted giving this permission fearing that UMass' intent was pretextual and that going behind the written letter to confirm things verbally would run the risk of misstating the doctors (eventually in 2017, Dr. Saxena asked UMass to put their questions in writing for the physicians but UMass refused to do this). Further, internal notes from December 2015 show that (see below and **Exhibit** G **at 2**) indeed UMass knew all along that a hazmat suit does not work. In a hearing held on March 16, 2023, UMass acknowledged that they wanted to speak to the doctors to see why a hazmat suit doesn't work. However, UMass has known all along that a hazmat suit with a respirator does not work, precisely because Dr. Saxena had repeatedly told

them that respirators in the past did not work (and UMass itself acknowledged this in internal notes from December 2015—**Exhibit** G **at 2**—see below).

Dr. Saxena was forced to withdraw from anatomy laboratory in early Spring 2015. On May 13, 2015, UMass exposed Dr. Saxena to formaldehyde in a different course (foundations of health) where Dr. Saxena suffered an allergic reaction and visited the emergency room because of suffering a severe cough and breathing difficulty. The ER physician diagnosed Dr. Saxena as having suffered an acute allergic reaction of type E1 and suggested to Dr. Saxena via the discharge note to avoid any future exposure to formaldehyde. **Exhibit** H.

Dr. Saxena presented this discharge letter (**Exhibit** I **at 3**) to a progress board committee (July 29, 2015) at UMass convened to see if Dr. Saxena would be promoted to year 2. The committee recommended that Dr. Saxena proceed to year 2 with accommodations set up by the anatomy instructors (with input as needed from the accommodations office). (UMass in the hearing on March 16, 2023 seems to ignore this diagnosis and claims that there is no diagnosis and no allergy—although the bar for having a disability should not rise to an allergy, Dr. Saxena has been diagnosed with an allergy).

The anatomy instructors (September 25, 2015) recommended that Dr. Saxena enter the anatomy lab and rather than doing the dissection, that he just stand there. These recommendations had been rejected (seen in internal emails obtained in discovery around August 18, 2015) by both the accommodations officers (**Exhibit** J). In spite of these rejections, UMass then presented this strange accommodation to Dr. Saxena over a month later on September 25, 2015. Dr. Saxena raised objections that this doesn't address his allergy to formaldehyde and since he wasn't going to be required to do any dissections (presumably the

most important reason to enter the anatomy lab), that he be allowed to watch the dissections over video or across a glass partition.

UMass informed Dr. Saxena that they had changed the curriculum that year and that students were now required to interact with each other and that to avoid formaldehyde Dr. Saxena put on a hazmat with a respirator. It wasn't clear to Dr. Saxena how he would be able to interact with other students in a hazmat suit via which communication is next to impossible. This happened around September 25, 2015.

In November 2015, UMass via one of the deans, Dr. Sonia Chimienti (who had been handling this matter since the beginning of summer 2015 and who had been the central figure in all communications dealing with this matter and who had been present in the September 25 meeting with one of the anatomy instructors), asked Dr. Saxena to find his own accommodation by calling several hundred schools and to see if any school would allow him to take anatomy safely.

In the next progress board meeting that occurred on December 16, 2015 UMass acknowledged (via internal notes obtained in discovery) that a hazmat suit indeed does not prevent the exposure to formaldehyde, thus showing that UMass' desire to speak to Dr. Saxena's physicians was indeed pretextual. UMass informed the court in a hearing held on March 16, 2023 that they simply wanted to find out why a hazmat suit doesn't work when internal meeting notes from December 2015 show that UMass was very aware that indeed a hazmat suit doesn't work in preventing exposure to formaldehyde.

Please see **Exhibit** G **at 2** (emphasis added):

"The Board asked Dr. Gilroy why in terms of trying to accommodate Mr. Saxena for learning Anatomy wasn't he offered the opportunity to observe dissection as opposed to having him wear **a hazmat suit and respirator which could exposed [sic] him to formaldehyde?**"

In January 2016 Dr. Saxena was put on a forced leave of absence. Before being put on leave, Dr. Chimienti again asked Dr. Saxena to reach out to several hundred schools to see if he can find his safe accommodation. Asking the student to procure his own accommodation is prohibited under the rehabilitation act and the ADA.

In January 2016, Dr. Saxena heard back from one of the Professors that Dr. Chimienti had asked Dr. Saxena to reach out to. Dr. Paulette Bernd is the professor of anatomy at Columbia University school of medicine and she informed Dr. Saxena that indeed they had a student similar to Dr. Saxena and they were able to accommodate him by letting him study anatomy via plastinated cadavers at NYU school of dentistry and by referencing Columbia University's dissector book.

Over the next several months Dr. Saxena tried to find someplace that would allow him the opportunity to study anatomy safely and in around July 2016, he was able to secure in writing an offer from the University of Texas in Houston school of dentistry to be taught anatomy safely. Dr. Robert Spears is the head of anatomy at the Univeristy of Texas in Houston and he offered to teach anatomy to Dr. Saxena following the curriculum at UMass and that he would only charge between $1500-$2000 to do this. He asked Dr. Saxena to get UMass to fill out the forms in writing.

Umass rejected this offer eventually.

Internal discussions show that UMass was worried that this could set a precedent and that if students were allowed to transfer anatomy credits via an academic route, it might allow other students to do this and that indeed treating this as a medical disability would be preferable. Dr. Chimienti who herself had suggested to Dr. Saxena that this go via an academic route now with these recommendations from another dean (Dr. Melissa Fischer—the one who reaffirmed Dr. Chimienti's mention of this setting a precedent and that it would be better to treat this as a disability related request—**Exhibit K**) seemed to switch course and asked Dr. Saxena to revisit the accommodations office.

The accommodations office (Dr. DeMarco) rejected this offer from Texas on March 15, 2017, and told Dr. Saxena to put on a hazmat suit saying that a hazmat suit works even for viruses such as ebola (**Exhibit D at 4**). This was a disingenuous analogy, because an ebola virus particle is far larger than a formaldehyde gas molecule and there are known cases of people being infected with ebola even after wearing a hazmat suit. Secondly, it was UMass itself that had on several occassions (via Dr. Chimienti and via faculty at the progress board in December 2015) asked Dr. Saxena to find a school where he could take anatomy safely. This is how the accommodations committee justified its refusal to allow anatomy to be taken safely at UTexas viz that it was premature to consider going to Texas, because Dr. Saxena had failed to convince UMass that there indeed is a disability and thus putting on the hazmat suit is their way of providing a useless 'accommodation' that UMass had acknowledged does not work (please see above and **Exhibit G at 2**). Thus, UMass will only work in providing a reasonable accommodation if they are convinced that the disability is real. Thus, asking Dr. Saxena to find another school where he can take anatomy safely was pretextual. However, the prior exchange shown via **Exhibit K** shows that UMass was worried about precedent and did not have any intention of providing a reasonable accommodation.

Here is the exact wording that UMass provided in **Exhibit D at 4 and 5**:

*"Please note that while we acknowledge the suggestion you made to take the anatomy course at an institution in Texas, it would be premature to consider this because, as stated earlier in this letter, we have found there is insufficient documentation of your alleged allergy, the root cause, nature and extent of the effects of same, and accordingly, we are currently unable to review and decide what might be a fair and reasonable accommodation."*

Thirdly, during the pandemic which is caused by a far less dangerous virus than ebola, UMass did not put its students in a hazmat suit but rather presumably taught anatomy virtually (as it could easily have done right from the beginning for Dr. Saxena). This further shows the pretextual nature of UMass' insistence on putting on a hazmat suit.

**UMass has lied extensively**

Here is an example of how UMass has lied over the many years that Dr. Saxena has requested an accommodation. These lies continue during the litigation.

On October 31, 2016, Dr. Saxena obtained another letter from Dr. Scott Harris (**Exhibit L**) and provided it to UMass. Although all letters were also directly sent to UMass, perplexingly UMass (via Dr. Deborah DeMarco) repeatedly insisted that they don't accept letters that aren't sent to them directly and internal communications show that Dr. DeMarco repeated this lie to their counsel, James Healy on December 21, 2016 (**Exhibit M**),

"One important point that I neglected to mention-we have never received any of these letters directly from the treating physicians. Drs. Christian and Zheng's notes were first hand delivered to my office by the student and then faxed by the student to Dawn Carpenter. Dr. Harris' note was faxed to Dawn from the student"

The above is simply note true. Here are the instances showing direct receipt of letters (from UMass' own document production):

1. **Exhibit N** is a fax from Dr. Zheng's office received at Dawn Carpenter's office (accommodations office) (December 5, 2016).

2. **Exhibit O** is a fax from Dr. Harris' office to Dr. Chimienti (at UMass) (November 1, 2016). On the first page of this fax, it is noted that this fax was then sent to DeMarco internally within UMass.

3. **Exhibit P** is a fax from Dr. David Christiani's office to Dawn Carpenter dated November 28, 2016.

4. **Exhibit Q.** In this email from December 1, 2016, Dr. DeMarco confirms to Dr. Saxena that she has received letters from Dr. Christiani and Dr. Harris. Yet 20 days later, she then sends a message to their counsel stating that no letter has ever been received by her directly.

5. **Exhibit R.** This is a fax that was sent to UMass on December 9, 2016 informing UMass that letters have been sent directly from physicians' offices.

It should be noted that this lie was repeated in the letter that was sent denying Dr. Saxena's accommodation request on March 15, 2017 (**Exhibit D** at 3),

*"You were also reminded that the AAC requires that original letters from your treating physicians (on their letterhead with dates of service, findings, and diagnosis/prognosis included) needed to be sent directly from their offices to my office. In this regard, the AAC does not accept copies, faxed or hand-delivered, by students."*

It is important to show this because it shows that UMass has lied in the process relating to Dr. Saxena's accommodation and has not worked in good faith. Indeed, UMass has not taken an accommodation requested by a student seriously. UMass has continued these types of lies

during the litigation and it is Dr. Saxena's belief that they (UMass) believe they can do this

because they have a sympathetic and biased judge who himself seems to not take any of this

matter seriously.

**Another example of lies and how UMass blocked Dr. Saxena's ability to transfer away from UMass**

Dr. Chimienti in November 2015 had also told Dr. Saxena that he is also free to transfer from

UMass wholly. Seeing that no matter how much he tried to work with UMass in safely being able

to take anatomy and spending years on this, Dr. Saxena by 2018 decided to give up and

transfer from the school. He asked Dr. Chimienti for a letter of good standing from the school to

transfer to the University of South Carolina school of medicine in Columbia.

Initially USC Columbia seemed to be positive but after communicating with Dr. Chimienti they

seemed to change course. Dr. Saxena during litigation in 2022 learned that Dr. Chimienti had

misled USC Columbia on March 22, 2018 and told them that Dr. Saxena had requested a

waiver from performing dissection (**Exhibit S**). This is untrue since the very first offer that

UMass made to Dr. Saxena was that of a frozen cadaver (which Dr. Saxena had readily

accepted) and thus Dr. Chimienti had thwarted Dr. Saxena's ability to transfer schools. This

letter other than unfairly thwarting Dr. Saxena's ability to transfer and further harming his career

shows the malicious intent of UMass. The whole portion of that paragraph (of the letter Dr.

Chimienti sent Dr. Rhinehart at USC Columbia) is reproduced next in italics (note DSF is the

anatomy course at UMass), emphases added:

*"Dr. Saxena did not successfully complete the DSF coursework, expressing concerns about a*

*potential disability allegedly related to part of the DSF requirements. In the fall of his first year*

*(2014), Dr. Saxena asked the DSF course directors to **waive the requirement for dissection**. We advised him to contact our ADA Academic Accommodations Committee (AAC) in the event he wished to request accommodations for his stated disability. Our curriculum is a dissection-based for anatomy, and **we currently have no means by which to provide an alternate way to learn anatomy**. At UMMS, providing accommodations consistent with the ADA proceed through the AAC."*

There are even more problems with the above paragraph. Dr. Chimienti states that Dr. Saxena asked to waive dissection. This is a lie. Dr. Chimienti also says (in 2018) that "…we currently have no means by which to provide an alternate way to learn anatomy." This is also a lie. Because on September 25, 2015, Dr. Chimienti was present in the meeting Dr. Saxena had with one of the anatomy instructors, Dr. Julie Jonassen, where she presented the 'accommodation' that Dr. Saxena just stand in the anatomy lab and do no dissection. Also this very waiver from dissection that the anatomy instructors came up with was actually rejected by the accommodations office (**Exhibit J**) thus showing that Dr. Chimienti was not beig truthful.

Feeling that he was trapped, that he would not be given an accommodation that was safe and that he would not be able to transfer from UMass, Dr. Saxena filed suit in 2019.

The above summary only shows highlights and skips other matters such as threats made by UMass along with UMass removing Dr. Saxena from school without informing him among other matters.

**THE COURT HAS SHOWN BIAS**

During the course of the litigation, Dr. Saxena felt that the judge is biased. Here is a highlighted summary of how the court has shown bias (please see Affidavit under **Exhibit T**, the motion

accompanying the affidavit in **Exhibit U**, the motion for reconsideration of recusal in **Exhibit V**, and the Exhibits accompanying those two motions in **Exhibit W** for more details).

In a hearing held on October 24, 2019, there was repeated laughter in the courtroom from the Defense counsel at the judge's remarks (please see affidavit for the judge's recusal, **Exhibit T**). Dr. Saxena in that hearing felt that the judge was not taking the case seriously.

On April 1, 2022, Dr. Saxena's counsel requested a stay of proceedings because he (Dr. Saxena) has been ill for health matters not directly related to the litigation so that Dr. Saxena could visit with his physicians and focus on his health. The court told Dr. Saxena's counsel, "By the way, I gotta say. This is the sort of the anthem for this case. So I'm a little skeptical, but I'm willing to have you convince me."

In that hearing, Counsel for Defense seemed to blame Dr. Saxena for delays. However, of the 15 or so requests for extension that have been filed in the court, 10 have come from UMass and only 5 from Dr. Saxena. Dr. Saxena never objected to any requests for extensions from UMass. However, of the 5 requested by Dr. Saxena, UMass has objected to 2. The protective order for health reasons was also opposed by UMass. The court when it has denied extensions or stays has only selectively done so with Dr. Saxena.

Dr. Saxena's counsel then presented the court with a letter from a physician along with an MRI report showing a diagnosis of an arteriovenous malformation of the brain, a serious life-threatening condition, and counsel requested a stay of proceedings via a protective order. The court rejected this letter stating that it was conclusory and ordered Dr. Saxena to sit for depositions. This was docketed on August 2, 2022. However, one and two months after this protective order was denied, the judge allowed two extension requests from UMass (which were

allowed by Dr. Saxena's counsel) on September 14, 2022 and on November 8, 2022. Dr. Saxena was present when the discussion for an extension occurred on October 3, 2022 during his second deposition and the holiday season was mentioned as a rationale for the extension by Defendant's counsel.

Thus, the Defendant was in a rush to move on with the case and hold depositions on Dr. Saxena only to then come back one and two months later and request extensions for their own convenience. Dr. Saxena believes that Defendant is able to do such things because they have a biased and sympathetic judge.

Further, as mentioned in the affidavit for recusal (**Exhibit** T̄), Dr. Saxena noted that if the court believes that a serious condition supported by MRI findings does not warrant some stay of proceedings so that Dr. Saxena is able to visit with physicians to take care of his health, what weight will the same court place on an allergic condition to formaldehyde which is possibly not as serious as a brain arteriovenous malformation. Meanwhile, both the medical school requested and the judge granted, right after, several extensions.

On January 26, 2023, Judge Hillman informed the court that one of his relatives within the 3rd degree works at UMass Memorial Hospital which is an affiliate of UMass Medical School and asked to raise objections within 30 days. Within 30 days, Dr. Saxena's counsel asked for recusal (**Exhibit** X̄). UMass strongly opposed this request for recusal. This further created the appearance of bias. If indeed UMass had nothing to gain by judge Hillman's presence, they should have had no reason to oppose a request for recusal that judge Hillman himself invited. This recusal request was denied on March 9, 2023. An extension that was requested so that new counsel could prepare better for objections to summary judgment that were due on March 10, 2023 was also denied the same day. This created a complete overlap between recusal and

summary judgment. The judge should not have considered an extension at the same time that he was considering recusal. Please also see the section on timing below.

Dr. Saxena then filed an affidavit and a motion with the court with more details about the bias in the court along with a motion to reconsider recusal on April 8, 2023 (docketed on April 10, 2023) (**Exhibit** T̄, **Exhibit** Ū and **Exhibit** V̄) along with the exhibits for those motions presented here as **Exhibit** W̄ (Because the **Exhibit** W̄ itself is an Exhibit to the motions in **Exhibits** Ū and V̄, to keep numbering clear, Exhibits in the instant motion have a rectangular outline to differentiate from the 'sub'-exhibits presented in **Exhibit** W̄). The affidavit and the motions list the various ways in which the court has shown bias up until the point those had been filed.

Rather than consider these requests, the court on April 12, 2023, said that because this had not been filed by Dr. Saxena's counsel, that it was moot. The court thus took 2 days to deny these motions.

Dr. Saxena then requested permission from the court to handle this matter himself and reconsider the motions to recuse on April 18, 2023 given that the first request for recusal came from Dr. Saxena's counsel and that in the interests of justice, Dr. Saxena should be allowed to handle the matter of recusal himself and asked the court to reconsider (**Exhibit** Ȳ). Dr. Saxena also asked the court on April 18, 2023 to stay the case until an interlocutory appeal can be filed (**Exhibit** Z̄). It is unclear to Dr. Saxena why his counsel is unable to file further matters relating to recusal (along with other matters) when it was counsel himself that filed the initial request for recusal.

**The judge continued to make motions filed by Dr. Saxena moot**

Judge Hillman again refused to even consider the motions under **Exhibit** Y and **Exhibit** Z again calling them as moot on April 24, 2023. Dr. Saxena further filed a motion on April 27, 2023, to stay proceedings until a possible interlocutory appeal had been filed in case the judge was still not willing to recuse himself and asked the judge to reconsider the motions as moot given that canon 3(A)(4) of the federal code of judicial conduct provides that litigants should be heard, and to stay the case briefly as well since his counsel had been in the ER (**Exhibit** AA). Defendant opposed this motion asking the judge to find it as moot on May 1, 2023 and the judge followed suit finding it as moot on May 2, 2023. Since the federal code of judicial conduct under canon 3(A)(4) allows everyone who has an interest to be heard and does not say that a litigant is silenced if he has an attorney, it is somewhat perplexing why the court is not able to hear Dr. Saxena. In repeatedly not giving Dr. Saxena a voice to be heard, the court is further enhancing the appearance of bias. Also importantly, these filings have raised serious concerns about the environment surrounding this case. For example, UMass has given a substantially incomplete discovery, has refused depositions and has been abusive during the depositions (**Exhibits** T, U, V explain these matters in more detail and **Exhibit** W **subexhibit 7** shows all the documents that UMass has not provided).

On May 8, 2023, Dr. Saxena filed a motion to reconsider mootness arguing that a matter cannot be made moot simply because Plaintiff is represented by counsel (**Exhibit** BB). A matter is moot when it no longer is live. However, no definition of mootness (either under Title III or under prudential mootness) defines mootness in terms of the inability of a litigant to be heard if the litigant has counsel.

**The judge has ignored notifications about counsel negligence on the case**

Dr. Saxena has changed several counsel and it is statistically unlikely for most of them to show neglect in this very seemingly deliberate way, unless there is a unifying reason. Dr. Saxena does not know the reasons and cannot say why this is happening. And, Dr. Saxena does not want to distract from the central theme of this interlocutory appeal but wants to make note of this for the court since this matter could itself be very important. Dr. Saxena will likely approach other agencies as well about this matter and may also update the filing here with the details of those matters. Indeed Dr. Saxena did try to speak out about the neglect shown by counsel in 2021 and rather than take that matter seriously and sanction counsel, the judge sanctioned Dr. Saxena. Thus, the judge is acutely aware of something being amiss in the way the litigation has proceeded but has taken no action. And now, seeing that counsel have continued to play havoc with his case, when Dr. Saxena is not even raising issues overtly about his counsel but rather asking to be heard about recusal and matters related to the case, the judge has attempted to silence him yet again.

Indeed, the court has seen ample documentation where Dr. Saxena's own counsel have identified how other counsel have been severely deficient on representation (please see the motions filed by attorney Sonja Deyoe from September 2021, and especially the motion titled, "Memorandum in opposition to Defendant's motion for sanctions" from Sep 21, 2021 which explains the neglect shown by Dr. Saxena's counsel). Also please see the filing by Attorney Christopher Auriemma from April 11, 2023 where he informs the court that an Affidavit that should have accompanied summary judgment was never filed by Attorney Nicholas Gomes (**Exhibit CC**).

In early 2023, Dr. Saxena's then counsel, Mr. Nicholas Gomes, showed severe negligence on his case and ended up filing a highly incomplete Summary Judgment motion (incomplete sentences, paragraphs repeating verbatim, lack of Affidavit among other deficiencies). Dr. Saxena was forced to retain new counsel (who noted in an April filing--**Exhibit CC**--that the affidavit that should have been filed with summary judgment was not filed) roughly three days before the summary judgment motion deadline. Dr. Saxena's new counsel then requested an extension to come up to speed with the case on March 8, 2023. UMass' attorneys again seemed to blame Dr. Saxena for this and opposed this extension request. The court rejected this request on March 9, 2023--while also on the same day rejecting the request for recusal-- and in the hearing held on March 16, 2023, the judge seemed to blame Dr. Saxena (for changing attorneys) in not granting Dr. Saxena's counsel an extension. The court did not try to ascertain why counsel was changed but rather seemed to take Defendant's view on the matter. Please see the section on requests for extension for more details on this.

As mentioned earlier, UMass has also refused to hold its own depositions while it has conducted 4 depositions on Dr. Saxena. Dr. Saxena's depositions were abusive with Defendant counsel acknowledging that counsel repeatedly raised his voice. UMass has also been severely negligent in producing documents that were requested from it. When these documents were again requested from UMass in late December 2022, it again rejected the request. (Please see under **Exhibit W, subexhibit 9** and then under **subexhibit 9, subexhibit A**).

Dr. Saxena believes that UMass has done all this because the judge is biased and favors UMass. This belief has been reinforced in the hearing on March 16, 2023 and also in March, April 2023 where the court has repeatedly refused to consider what Dr. Saxena has placed before it.

Further, when these matters were even presented by Dr. Saxena's counsel, Defendant has repeatedly attempted to have these items removed from the court record (please see docket entries 139, 147, motions to strike on March 10 and 15, 2023 respectively; also please see Defendant's opposition to accept affidavit docket entry 159 from April 25, 2023).

Thus, not only has UMass not provided proper documents in discovery (the email that is mentioned in the motion to strike from March 15, 2023 should have been produced by UMass in their document production but never was), they are attempting to strike documents that were given to them in discovery.

**UMass Medical School and UMass Memorial Hospital are very linked contrary to the judge's later assertion in denying recusal**

In the notice to the court on January 26, 2023, the judge said that UMass Medical school and UMass Memorial hospital (where his relative is employed) are affiliated. However, in his denial for recusal, the judge then repeated what UMass had stated in their opposition for recusal, that UMass Medical School and UMass Memorial hospital are linked in name only. This is however not true as UMass Medical School has filed suit for $40 million dollars for the sale of a unit from UMass Memorial hospital (along with other details mentioned in **Exhibit T**, **Exhibit U**  and **Exhibit V**) showing that these two institutions are intricately linked. Newspaper reporting on this story confirms that these two institutions are closely allied (please see **Exhibit W**, **subexhibit 19**). Most importantly if these institutions were not allied or if there were not at least the appearance of linkage between these institutions, then why did judge Hillman notify the court and invite opposition?

**Timing issues are also important in this case**

In general when a litigant seeks to time a recusal for strategic reasons, it is considered inappropriate. However, in the instant case, the timing of the notification in the court on January 26, 2023 and how the recusal motion that was initially filed was rejected on the same day that a request for an extension was rejected created difficulty for Plaintiff because recusal matters overlapped severely with summary judgment matters. It is unclear to Dr. Saxena why the court created such overlap. The court should have allowed the recusal matter to play out on its own before bringing in deadlines for summary judgment motions. This also shows the court's bias.

**The court has taken no action when it was alerted to severe deficiencies in the litigation**

The judge has also been informed both by Dr. Saxena's counsel and by Dr. Saxena that Defendant has refused to provide complete document production and refuses depositions but the court has not taken any action on these matters. The litigation is very one-sided, with UMass openly attempting to silence what Dr. Saxena is placing in the court (either through counsel or either by himself) by explicitly asking the judge via docket entry 161 on May 1, 2023 to make Dr. Saxena's motion moot). Not only has UMass not allowed its depositions, they then produce affidavits from some of the same people that would need to be deposed.

There has been neglect on Dr. Saxena's case. Dr. Saxena isn't able to identify why there has been neglect but there has been neglect. When Dr. Saxena raised this matter in the court, rather than sanction Dr. Saxena's attorneys, it was Dr. Saxena himself who was sanctioned (docket entry 75 from November 16, 2021). The summary judgment motion that was filed on February 17, 2023 by Dr. Saxena's counsel was highly inadequate. When Dr. Saxena has tried

to cure the deficiencies shown by counsel by filing motions himself, the court has silenced him by making his motions moot.

**The court has not disclosed details about the relative working with the Defendant's affiliate**

As mentioned in the motion filed on April 18, 203 (**Exhibit** Y̲), three important pieces of information have been requested from the court and these have not been provided. The first is what is the relationship of the family member who is employed at UMass Memorial to the judge. The second is since when did the family member start employment at UMass Memorial. The third is what type of employment or position the family member is employed in at UMass Memorial. An additional piece of information that would also be important is the compensation this relative is drawing at UMass Memorial and what other benefits or perks are included in the employment.

**The court has been unsympathetic to genuine requests for extension by Dr. Saxena's counsel**

As mentioned above, there have been instances of neglect shown by prior counsel for Plaintiff-Appellant. However, when these instances of neglect were raised with the court, the court actually penalized the Plaintiff-Appellant. The neglect has been so severe that Dr. Saxena had to find new counsel around three days prior to the deadline for summary judgment motions. Judge Hillman did not attempt to ascertain why an extension had being requested, but rather dismissed the request for an extension on March 9, 2023, and then during the hearing held on March 16, 2023, Judge Hillman then confirmed that indeed he had denied the request for an extension, because he seemed to lay the blame for the lack of preparedness of Dr. Saxena's

counsel on Dr. Saxena. Please see **Exhibit** [T] which is the Affidavit filed by Dr. Saxena under 28 USC 144. Here is what the exchange was between Dr. Saxena's counsel and Judge Hillman from the aforementioned exhibit, reproduced below:

Attorney Joe Simons: "I apologize for not having a written opposition done for this and I don't want to make excuses..." the judge interjected,

"we are acutely aware that as they say in the uniform of commercial code that you were the latest holder in due course so no need to apologize" in a tone and manner showing that he believes this is Plaintiff's own fault for changing counsel. He didn't ask why counsel was changed.

**Inviting opposition and then denying the recusal itself creates a fear of retaliation**

By inviting opposition and then denying the opposition the judge has now created an bigger fear of bias in Dr. Saxena's mind, because now the judge may indeed retaliate for an opposition that he himself invited. One of the known fears of counsel in raising recusal is the fear of retaliation. However, when the judge himself invites opposition, it creates the expectation that if the opposition is raised, then the judge would recuse himself. In the instant case, the judge has now created an even stronger fear that he will now retaliate. Further, his past actions and actions after the recusal motions were filed via his making all subsequent motions filed by Dr. Saxena moot also show bias.

**By not acknowledging Dr. Saxena, the judge has further validated his prior action as having biased intent**

Dr. Saxena (along with his counsel) has raised very serious concerns about the court and about Defendant. Yet the court other than making motions moot has not addressed these concerns

(lack of depositions and very incomplete document production and abuse by Defendant as well as the bias in the court) by holding any hearings. This also shows very strong bias in the court.

**Plaintiff has raised concerns previous to the judge's notice**

In July and August 2021, Dr. Saxena filed complaints with various agencies about the court and what had been transpiring saying that "...the environment in the court doesn't engender much confidence in the impartiality of the court". These complaints predate the notice filed by the court in 2023 and in fact even predate the sanctions that the judge placed on Dr. Saxena on November 16, 2021. Dr. Saxena referred to events that transpired in the court in the October 24, 2019 hearing and thus Dr. Saxena has raised the issue of bias in the court far before the notice filed by the judge, because he has for years believed that this court is biased.

**RECUSAL IS CALLED FOR VIA BOTH 28 USC 144 AND 28 USC 455**

Under both 28 USC 455 and 28 USC 144, judge Hillman should be removed. The standard for removal of a judge is that even the appearance of bias is grounds for removal and in this case, the affidavit that was filed by Plaintiff (**Exhibit** 1) points to several instances where judge Hillman has shown bias. When this is superimposed on the notification in the court that a relative of Judge Hillman works at an affiliate institution of the Defendant, with the added fact that the court keeps making motions filed in the court moot, there is enough in this matter that would justify removal of Judge Hillman from this case.

**AN INTERLOCUTORY APPEAL IS NECESSARY TO PRESERVE DR. SAXENA'S RIGHTS**

**Exhibit** 2 is the motion that was filed requesting a stay while an interlocutory appeal is filed. Many of the following arguments are reproduced from there.

A recusal is an important matter and should be handled such that no other proceedings occur concurrently. Even an inordinate delay in a case so that recusal matters are handled appropriately is allowed because the administration of justice takes priority over the quick and efficient processing of a case. This is because deciding on other matters while the motion to recuse is pending can cause irrevocable harm to accrue to the case when the movant to recuse believes that the court is biased.

It is feared that based on the recent history of how recusal was communicated and how various motions were allowed to be filed while the notice period was ongoing and how rulings were released concurrently with the denial of recusal, that further overlap will occur while the recusal matter is being handled. Thus, it is important to stay all proceedings that don't deal with the matter of recusal.

**An interlocutory appeal is necessary because the recusal was first denied and further motions were made moot by the district court**

A motion to recuse is immediately appealable via an interlocutory appeal and in this case the first motion to recuse was denied and further motions following up on it filed by Dr. Saxena have been made moot.

An immediate/interlocutory appeal is necessary to preserve justice. According to Cassandra Burke Robertson & Gregory Hilbert in "judicial disqualification on appeal",

"Because trial-court procedure leaves it to the trial judge to decide whether he or she "is or appears to be biased," then-Professor (now Judge) Karen Nelson Moore wrote three decades ago that "swift review [via an immediate/interlocutory appeal] is essential to ensure impartiality.""

Burke Robertson continues that irrevocable harm can accrue to the case if the recusal matter (and its possible denial) is not reviewed immediately by an independent judicial body,

"Furthermore, when it comes to motions based on the appearance of partiality, courts have also pointed to the difficulty of providing a full remedy on appeal. The D.C. Circuit recently concluded that "ordinary appellate review following a final judgment is 'insufficient' to cure 'the existence of actual or apparent bias," because "it is too difficult to detect all of the ways that [actual] bias can influence a proceeding." Even reversing a judgment for "apparent bias . . . fails to restore public confidence in the integrity of the judicial process." If disqualification based on appearance is meant to protect trust in the impartiality of the judicial system, then waiting until after final judgment to rectify the appearance of bias undercuts that goal. As a result, most federal courts have recognized that judicial disqualification questions cannot always wait until after final judgment."

(Now judge) Karen Nelson Moore wrote in her paper from 1984 "Appellate Review of Judicial Disqualification Decisions in the Federal Courts",

"Courts have noted that the postponement of appellate review of disqualification orders has a particularly negative effect on the administration of justice.  Moreover, the effect of bias charges upon the judge may pervade the trial and make appeal after final judgment ineffective.  In virtually all appellate opinions these factors have been mentioned without special regard for the type of the disqualification at issue."

The collateral order doctrine applies for recusal. According to the same paper by (judge) Karen Nelson Moore,

"The collateral order doctrine was developed over thirty years ago in Cohen v. Beneficial Industrial Loan Corp. The Supreme Court determined that an interlocutory order is immediately appealable if it falls "in that small class which finally determine[s] claims of right separable from; and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."

Judge Nelson Moore further says,

"Delayed review of an order denying disqualification of a judge with a proscribed relationship would leave that judge in a position to issue numerous orders fundamentally shaping the case. Any bias resulting from the proscribed relationship could influence the judge, whether consciously or unconsciously, in making the rulings."

She further says,

"Effective review on appeal from a final judgment in judicial disqualification cases will usually be extremely difficult and will be inadequate to preserve the fact and appearance of impartiality. As noted above in connection with mandamus, delay of review poses two crucial problems. First, if the judge erred in refusing to disqualify himself, then judicial bias may infect the entire proceeding, not just the trial. The difficulty of proving how bias affected particular rulings may compel beginning the whole proceeding anew. Moreover, the impact of certain biased rulings may never be negated. Second, it may be impossible to undo the damage to the judicial system caused by the impression of partiality given to the litigants and public."

**Justice takes precedence over quick resolution of the case**

Judge Nelson Moore further states that justice is more important than delays from resolving the matter of recusal (emphasis added),

"Finally, the goal of efficient judicial administration must be balanced against **the more fundamental goal** of impartial judicial administration."

**This case should be stayed at the district court until the matter of recusal is resolved**

In the motion to recuse and reconsider recusal, Dr. Saxena has informed the court that Defendant has not worked in good faith in this litigation such as not providing complete

discovery and refusing to hold depositions while conducting several depositions on the Plaintiff, Dr. Saxena.

The Defendant is now seeking to strike the whole undisputed section of Dr. Saxena's motion for summary judgment and wants to also strike an affidavit filed with Dr. Saxena's opposition to summary judgment containing an email that was provided to UMass. Rather than doing a comprehensive search on its own database to provide complete discovery to Dr. Saxena, UMass is now trying to remove evidence that Dr. Saxena provided it via his own discovery submissions.

Because there is a question of the neutrality of judge Hillman in this matter, any decision taken over discovery or even summary judgment while the question of recusal is not allowed to run its complete course can severely irrevocably prejudice the case.

Therefore, Dr. Saxena prays that the court will grant this motion to stay proceedings in the district court until this request for an interlocutory appeal has been considered.

Dr. Saxena also prays that the court will take up the matter of whether the mootness that judge Hillman has raised about motions being filed by Plaintiff rather than counsel is appropriate under 1292(b). Dr. Saxena has requested the district court to consider approaching the appellate court to have this considered but given the way the district court has silenced Dr. Saxena so far, it is unlikely this permission will be granted. However, even if the the matter of mootness cannot be reviewed under 1292(b), Dr. Saxena requests the honorable appeals court to consider it under any mechanism possible as it may have importance to other litigants as well.

**CONCLUSION**

Dr. Saxena therefore requests the honorable first circuit to reassign the case to a different judge and to grant a stay of proceedings in the district court while reassignment is considered.

Dr. Vishal Saxena

May 15, 2023