# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **VISHAL SAXENA, PH.D,**      ) <br>    **Plaintiff**           ) <br>           ) <br> **v.**                  ) <br>           ) <br> **UNIVERSITY OF MASSACHUSETTS** ) <br> **MEDICAL SCHOOL,**     ) <br>    **Defendant.**       ) <br>           ) | **CIVIL ACTION** <br> **NO. 19-40007-TSH** |

## MEMORANDUM OF DECISION AND ORDER
### September 28, 2023

**HILLMAN, S.D.J.**

This action arises out of the former academic relationship between Defendant, University of Massachusetts Chan Medical School (the "Medical School" or "the School"), and its former student, Vishal Saxena ("Plaintiff"). Plaintiff's Complaint – first filed on January 7, 2019 and later amended on May 15, 2019 – asserts four remaining claims against the Medical School: Counts IV & VI allege disability discrimination in violation of Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("the "Rehabilitation Act") and Counts V & VII allege retaliation in violation of Title V of the ADA and the Rehabilitation Act.[1] This Memorandum and Order of Decision addresses: (1) the Medical School's Motion for Summary Judgment (Docket No. 124); (2) Plaintiff's Motion for Summary Judgment (Docket No. 127); (3) the Medical School's Motion to Strike Plaintiff's Statement of

---

[1] Plaintiff's Complaint originally contained eight counts. See Docket No. 1. However, upon a Partial Motion to Dismiss by the Medical School (Docket Nos. 9-10), this Court dismissed Counts 1, 2 and 3, alleging age discrimination, race/national origin discrimination, and retaliation, respectively, all in violation of M.G.L. c. 151B. See Docket No. 23. On March 24, 2022, the parties stipulated to the dismissal with prejudice of Count 8 of Plaintiff's Complaint alleging invasion of privacy. See Docket No. 92.

Material Facts (Docket No. 139); (4) the Medical School's Motion to Strike Plaintiff's

Opposition (Docket No. 147) to its Motion; and (5) Plaintiff's Motion to Accept Affidavit in

Support of Motion for Summary Judgment (Docket No. 154).[2]

## MOTIONS TO STRIKE

The Medical School seeks to strike Exhibits A and B attached to Plaintiff's Opposition to

the Medical School's Motion for Summary Judgment (Docket Nos. 142-2 and 142-3), as well as

portions of Plaintiff's Affidavit (Docket No. 142-1) on the grounds that Plaintiff failed to comply

with the requirements of Local Rule 56.1. This rule states, in relevant part, that "[m]otions for

summary judgment shall include a concise statement of the material facts of record as to which

the moving party contends there is no genuine issue to be tried, with page references to

affidavits, depositions, and other documentation." L.R. 56.1 explicitly provides that "[f]ailure to

include such a statement [with references to affidavits, depositions, and other documents]

constitutes grounds for denial of the motion." The Medical School further contends that Exhibits

A and B constitute inadmissible hearsay, that parts of Plaintiff's Affidavit are not based on his

own personal knowledge, and contain argument or conclusory assertions.

The Court agrees with the Medical School that Plaintiff has failed to comply with the

requirements of L.R. 56.1 in that many of the factual assertions contained in Plaintiff's

supporting memorandum are not cited in his statement of facts; do not cite to record support for

many factual averments; and Plaintiff mischaracterizes or miscites record evidence on numerous

occasions. The Court appreciates the efforts on the part of the Medical School to organize each

statement of fact and its argument. It is inefficient, however, for the Court to parse through each

factual averment in this Order. Therefore, the Court will *grant* Defendant's motion to the extent

---

[2] The Plaintiff has also filed two pro se motions (Docket No. 180 and 182) seeking interlocutory appeal of this
Court's denial of his motion to recuse and a pro se motion for leave to file electronically (Docket No. 186).

that it will not consider factual averments that have no support in the record, and those factual averments that miscite or mischaracterize the record evidence.[3] In such instances, the Court has accepted the Medical School's asserted facts as true.

## MOTION TO ACCEPT LATE-FILED AFFIDAVIT

Plaintiff seeks to have the Court accept the late filing of his affidavit in support of his motion for summary judgment on April 11, 2023, nearly two months after he filed for summary judgment. Plaintiff filed for summary judgment on February 17, 2023, and failed to file a supporting affidavit. Counsel for the Medical School emailed counsel for the Plaintiff on February 21, 203, advising him of the deficiency, but no attempt was made to rectify the issue. Plaintiff was further noticed about the missing affidavit in the Medical School's motion to strike filed on March 10, 2023, and again, during the summary judgment hearing on March 16, 2023. Plaintiff contends that his prior counsel who filed the summary judgment motion "failed to file the affidavit" and suggests that the affidavit had been prepared around the time of the summary judgment motion. However, the affidavit references arguments made by the Medical School *at the summary judgment hearing* and raised by the Medical School's motion to strike. Furthermore, the Court allowed the parties two extensions of time to file their dispositive motions, leaving Plaintiff amply opportunity to submit an affidavit or cure the deficiencies. Plaintiff's motion is denied.

---

[3] Exhibits B, C, F, G, H, O, P, Q to Plaintiff's Statement were not provided to the Medical School. See the Medical School's Response, Docket No. 140. Given that these exhibits were not provided to the Medical School, the Court will not consider them for the purposes of the evaluating whether the Medical School failed to accommodate Plaintiff.

**Background**

<u>University of Massachusetts Medical School</u>

The Medical School is the Commonwealth's only public medical school and is part of the University of Massachusetts education system. The Medical School's policies as they apply to its students are spelled out in the Medical School Student Handbook (the "Student Handbook"), which was in effect during the 2014-2015 academic year.  The Medical School has a policy that states it does not discriminate on the basis of race, color, creed, religion, gender, age, sexual orientation, gender identity and expression, genetic information, national origin, covered veteran disability, disability, ancestry or any other characteristics protected by law in the participation in its programs, services and activities, and has established a procedure by which medical students may request an academic accommodation for their disabilities. A copy of the Student Handbook is provided to all medical students. The Medical School expects all of its students to read and be familiar with the Student Handbook and all medical students are held to the policies and procedures of the Student Handbook, regardless of whether they ultimately choose to read the document.

The Student Handbook contains the Medical School's policies and regulations, including those relating to monitoring the academic performance of its students. The Medical School has also adopted Guidelines for Professional Behavior to which it expects its students to adhere (the "Guidelines"). The Student Handbook (and subsequent student handbooks from later years) provides a link to the Guidelines, which require, in part, that students "demonstrate[e] dependability and appropriate initiative" including "complet[ing] tasks in a timely fashion without needed reminders" and being "appropriately available for professional responsibilities"

including "attend[ing] required classes and activities." These Guidelines were in effect throughout Plaintiff's tenure with the Medical School.

At the Medical School, students' academic records are monitored by two Academic Evaluation Boards, a Basic Sciences Academic Evaluation Board ("BSAEB") and a Clinical Sciences Academic Evaluation Board. The BSAEB monitored Plaintiff's academic performance during his tenure at the Medical School. The BSAEB is responsible for periodically reviewing student academic records, recommending students to the Progress Board for academic advancement, remediation, dismissal, considering any extenuating circumstances which may have contributed to academic performance, and determining the nature and process of academic makeup and remediation, if possible, for students who have not satisfactorily completed all academic requirements. The Progress Board is a standing subcommittee of the Educational Policy Committee that meets only when a recommendation of the BSAEB is made that is considered an "adverse recommendation." An "adverse recommendation" by the BSAEB is a recommendation to the Progress Board to have a student (1) repeat a whole semester or an entire year; (2) enter a less than full-time or other program which will delay the student's time of graduation; (3) take a leave of absence at the initiative of the Progress Board rather than of the student; or (4) be dismissed.

The curriculum of a first-year medical student ("FOM1") includes the course Development, Structure and Function ("DSF"). DSF consists of anatomy, physiology, histology, and embryology. DSF is a year-long course during FOM1, and consists of both a classroom component and a lab component.

Plaintiff's Enrollment in the Medical School

Plaintiff was accepted at the Medical School in May 2014 and received an Acceptance Letter, which among other things, identified how to begin the process of applying for academic

accommodations. The Acceptance Letter also instructed students requesting a reasonable accommodation for a disability to reach out to Dr. Deborah Harmon Hines ("Dr. Hines"), co-Chair of the Academic Accommodations Committee ("AAC").  and contained Dr. Hines' contact information.

Plaintiff testified that he considered himself as having a disability at that time and conceded that it would have been reasonable form him to reach out to Dr. Harmon-Hines prior to starting at the Medical School concerning the accommodation process. Plaintiff did not contact anyone at the Medical School following his acceptance or during the summer of 2014 to notify the Medical School of his alleged reactivity to formaldehyde or to request an academic accommodation. On September 25, 2014, Plaintiff contacted his instructor of the DSF course, Associate Professor Anne Gilroy ("Prof. Gilroy"), to notify her about his alleged reactivity to formaldehyde. Plaintiff testified that he knew that Prof. Gilroy was not the correct person he should have contacted, per the Acceptance Letter.

At the time Plaintiff contacted Prof. Gilroy, she was out of the country and would not be return until October 6, 2014. Given that the first anatomy lab of DSF was scheduled for October 1, 2014, Prof. Gilroy contacted her colleagues, Dr. Susan Gagliardi, Vice Chair of Medical Education, Department of Cell Biology, and Chair of the FOM1 Curriculum Committee and Michael Doyle, Lab Manager at the Medical School, for assistance. At the time Prof. Gilroy was not aware that, in order for Plaintiff to pursue an academic accommodation for DSF, Plaintiff needed to contact the AAC. Prof. Gilroy did know, however, that she did not have the ability or authority to grant academic accommodations for students. Dr. Gagliardi was aware of the timeliness of her response to give Plaintiff the best opportunity to participate in the anatomy lab on October 1, 2014.

At the time Dr. Gagliardi made her inquiries on September 25, 2014, she was not aware that, in order for a medical student to receive academic accommodations at the Medical School, the student needed to go through the AAC. That same day, Dr. Gagliardi was told that Plaintiff would need to be evaluated by the Medical School's Student Health Services ("Student Heath") and conveyed this information to Plaintiff the same day. Dr. Gagliardi was under the impression that the Medical School's Office of Environmental Health & Services ("EHS") would work with Student Health to implement any action needed and told this to Plaintiff.

Plaintiff was evaluated in Student Health by Dr. Joseph DiFranza ("Dr. DiFranza") on September 30, 2014. Dr. DiFranza's conclusion based on his evaluation was that Plaintiff has "irritant symptoms when exposed to formaldehyde (watery eyes, burning nose, throat, lungs, dizzy, headache).  Nothing life threatening…"  Dr. Gagliardi shared Dr. DiFranza's conclusion with Deborah Campbell, the Medical School's Environmental Health and Safety Manager ("Ms. Campbell"), on October 1, 2014. Dr. Gagliardi notified Ms. Campbell to give her the opportunity to make suggestions concerning how to help Plaintiff, including fitting him with protective gear. Dr. Gagliardi learned that Plaintiff's takeaway from his evaluation by Dr. DiFranza was that he could not enter the anatomy laboratory, even with protective equipment in place, which Dr. DiFranza denied. Dr. Gagliardi believed at the time that Plaintiff was not medically prohibited from entering the anatomy lab. Plaintiff did not attend the anatomy lab on October 1, 2014.

On October 2, 2014, Dr. Gagliardi learned from Dr. Hines that in order to be accommodated for working in the gross anatomy lab, Plaintiff needed to contact Dr. Hines. Dr. Gagliardi also learned, for the first time, that Plaintiff's request for an academic accommodation fell under the purview of the AAC. Upon learning of the Medical School's process for applying

for academic accommodations, Dr. Gagliardi immediately notified Plaintiff. In reply, Plaintiff thanked Dr. Gagliardi for her "kind email" and wrote that he "really appreciate[d] [her] help."

The Academic Accommodations Committee (AAC)

The Medical School established the AAC to receive and review all requests for accommodations and appropriate supporting documents. The AAC then designs, implements, and monitors individual accommodation plans for students with disabilities in compliance with the Americans with Disabilities Act.

The AAC is chaired by one or two individuals who are Medical School employees, each of whom also serve as voting members of the AAC. The AAC is further comprised of individuals from the Medical School, the Tan Chingfen Graduate School of Nursing, and the Morningside Graduate School of Biomedical Sciences. The AAC generally meets once a month to review requests for accommodations made by students, to approve, deny or request additional information from students in support of requests for accommodation, and to monitor the status of students approved for accommodations. Between the 2014 and 2018 academic year, the AAC provided academic accommodations to an average of 38 students per year at the Medical School, the Tan Chingfen Graduate School of Nursing, and the Morningside Graduate School of Biomedical Sciences.

The AAC has adopted a policy governing a student's request for academic accommodations. Pursuant to that policy, students seeking an academic accommodation are required to submit appropriate documentation of their disability when the disability and/or need for accommodation is not known or obvious. As of 2014, it had also been the longstanding practice of the AAC to request additional documentation from a student beyond that which he or she may have submitted if the AAC determined that the

documentation submitted was insufficient to rule on their request.  It had also been the long-standing practice of the AAC to request permission from a student to speak directly with the student's treating provider to gain additional information when necessary, including historical documentation relating to the asserted disability, or to seek clarification on the information the student had provided.

Applying for Academic Accommodations with the AAC

Plaintiff met with Dr. Hines on October 2, 2014, to discuss his request for an academic accommodation. Dr. Hines was a Professor of Cell Biology at the Medical School and, in addition to that role, served as Chair of the AAC from 1999 until approximately 2012, and then served as Co-Chair of the AAC from approximately 2012 until her retirement in 2016. After Plaintiff's initial meeting with Dr. Hines, he was referred to Dr. Deborah DeMarco, Co-Chair of the AAC at the time. Dr. DeMarco primarily handled Plaintiff's request for an academic accommodation from that point forward.

Plaintiff understood that meeting with the AAC was part of the process of applying for an academic accommodation.[4] He was responsible for all DSF requirements, including quizzes, labs, and exams, while his request for an academic accommodation was pending. Prof. Gilroy advised Plaintiff of this fact. Plaintiff testified that he understood that he was fully responsible for any anatomy coursework in the absence of being granted an academic accommodation.

Plaintiff met with Dr. DeMarco on October 7, 2014. The purpose of this meeting was to discuss the process of applying for academic accommodations in light of the fact that Plaintiff had disclosed to the Medical School that he previously had a reactivity to formaldehyde. At this meeting, Dr. DeMarco explained the academic accommodations process at the Medical School to

---

[4] It is disputed whether Plaintiff believed that the anatomy course directors could have provided academic accommodations until he completed the process with the AAC.

Plaintiff. Plaintiff informed Dr. DeMarco that he was exposed to formaldehyde at Boston University School of Medicine ("BU").

At this meeting, Plaintiff informed Dr. DeMarco that he tried a face mask and a "respirator-type mask" at BU in response to his reactions. Plaintiff informed Dr. DeMarco that he purchased these personal protective devices on his own, and that they were not purchased and professionally fitted by BU. At the same meeting, Plaintiff briefly showed Dr. DeMarco a note he received from Dr. Michael Reyes, a family medicine practitioner who evaluated Plaintiff on October 2, 2014. The note was based on what Plaintiff verbally conveyed to Dr. Reyes about his prior reactions to formaldehyde and was not based on treatment of Plaintiff following his reactions to formaldehyde at BU or first-hand knowledge of Plaintiff's reactions. Dr. DeMarco did not believe that the Reyes' Note was sufficient to support Plaintiff's request for an academic accommodation because it did not comply with the requirements of the Policy, and contained a number of other deficiencies.

Dr. DeMarco advised Plaintiff that Dr. Reyes' Note was insufficient for the AAC to rule on his request reasonably and fairly. The Reyes' Note was not signed by Dr. Reyes, nor did it contain a diagnosis. The Reyes Notes was also missing Plaintiff's prior medical history related to formaldehyde, discussion about the symptoms Plaintiff experienced, or a conclusion as to whether Plaintiff's reactivity to formaldehyde is inhalant-based or contact-based. Plaintiff conceded that it would have been reasonable for the Medical School to have this information. Dr. Reyes' Note did not include any discussion about possible accommodations nor suggest that Plaintiff should not enter the anatomy lab at the Medical School. Dr. Reyes referred Plaintiff to an allergist "for further workup and evaluation to determine proper treatment strategy," which

Plaintiff recalls Dr. DeMarco also suggesting to him when they met. Plaintiff informed Dr. DeMarco that he would see an allergist.

<u>The Plan for Handling Plaintiff's Request for Academic Accommodations</u>

Dr. DeMarco developed the following action plan at the end of the October 7, 2014, meeting with the Plaintiff:

> a.      Plaintiff would make an appointment to see an allergist as soon as possible.

> b.      She would discuss options for accommodations with Dr. Gagliardi and Prof. Gilroy.

> c.      She would discuss potential protective gear with the EHS for use by Plaintiff during his anatomy lab.

> d.      After discussing potential accommodations, Dr. DeMarco would determine whether the AAC would agree to provide Plaintiff with temporary accommodations until he has had the opportunity to meet with, and obtain the necessary documentation from an allergist.

The AAC had the authority to provide Plaintiff with temporary accommodations while it waited for Plaintiff to provide additional documentation. After meeting with Plaintiff, Dr. DeMarco spoke with Prof. Gilroy and Dr. Gagliardi on October 14, 2014, regarding possible accommodations for Plaintiff for when he provided required documentation to the AAC. Based on that conversation, Dr. DeMarco came to the following conclusions:

> a.      There was no "fresh tissue" available at the Medical School for dissection. If fresh tissue was obtained, the Medical School would need to purchase a freezer large enough to accommodate big sections of the cadaver.

> b.      Once a section of the cadaver was unthawed, the fresh sections would need to be dissected within a few days, which would require extra time on the part of the student as well as additional faculty time.

> c.      The Medical School would need to designate a different room in which the fresh cadaver could be dissected, separate from the anatomy lab.

> d.      The Medical School could consider purchasing a "down-draft" table upon receipt of the necessary medical information from Plaintiff.

e.      The Medical School could provide hazmat gear to Plaintiff.

f.      For the October 23rd lab, the Medical School could accommodate Plaintiff by allowing him to dissect a fresh calf heart in a room separate from the anatomy lab with a faculty member overseeing the process who had not had contact in the anatomy lab.

On October 9, 2014, Dr. DeMarco spoke with Ms. Campbell from EHS.  Dr. DeMarco learned that as a temporary accommodation for Plaintiff, EHS could provide full hazmat gear and a professionally fitted respirator for Plaintiff. That same day, Dr. DeMarco provided Plaintiff with a copy of the safety data sheets for the materials used in the embalming cadavers at the Medical School and suggested that Plaintiff bring these sheets to his appointment with an allergist. Dr. DeMarco also recommended to Plaintiff that he obtain safety data sheets from BU because the components used by BU to embalm cadavers might be different.

On October 9, 2014, the AAC approved Plaintiff for temporary accommodations, while Plaintiff's request for an academic accommodation was pending. Specifically, the AAC approved Plaintiff for: (1) full hazmat gear, including a respirator fitted to his head; and (2) a separate room for a calf heart dissection on October 23, 2014, which was the next scheduled anatomy lab.[5] The calf heart was a fresh specimen, meaning that Plaintiff would not be exposed to any offending chemicals. The AAC also gave Plaintiff the opportunity to enter the anatomy lab in protective gear for the first time outside of regular class time, with a physician present to monitor Plaintiff's wellbeing.

The AAC provided these temporary accommodations because it did not know the nature of Plaintiff's allergic response and put them in place through the end of November 2014, and was prepared to modify or extend them, if shown to be necessary, based on any documentation it

---

[5] Prof. Gilroy volunteered to work with Plaintiff for the calf heart dissection. When Prof. Gilroy volunteered, she informed Dr. Gagliardi that she would like to "get a good read on [Plaintiff's] attitude." Plaintiff felt that Prof. Gilroy's comment was discriminatory but he did participate in the dissection of the fresh calf heart with Prof. Gilroy on October 25, 2014.

received following Plaintiff's appointment with his allergist.  The AAC directed Plaintiff to

contact EHS as soon as possible to make an appointment for respirator fit testing. Plaintiff never

contacted EHS.

　　　In response to the AAC's offer of temporary accommodations, Plaintiff wrote that he had

"used both a respirator and a respirator with a full-face mask and [that] his reactions continued to

get worse …  I am assuming the hazmat gear for my head is the same type of protection that I

have previously used." At the same time, however, Plaintiff admitted that he did not know what

equipment the Medical School's EHS had. Dr. DeMarco believed that the AAC's offer of

temporary accommodations was a reasonable and supportable plan that Plaintiff should try and

advised Plaintiff of her belief. Plaintiff stated that he believed Dr. DeMarco's position was

discriminatory.

Christiani and Zheng Notes

　　　On November 13, 2014, Plaintiff hand-delivered two letters to Dr. DeMarco's mailbox in

her office. One letter was from Dr. David Christiani ("Dr. Christiani"), and the second was from

Dr. Weihong Zheng ("Dr. Zheng"). After receiving the Christiani Note and the Zheng Note, Dr.

DeMarco spoke with Dr. Oren P. Schaefer ("Dr. Schaefer"), a physician in the UMass Memorial

system. Dr. DeMarco contacted Dr. Schaefer in particular because he specializes in pulmonary

disease, critical care medicine, and allergy & immunology. It was the regular practice of the

AAC to contact outside experts when evaluating a student's request for an accommodation. The

purpose of Dr. DeMarco's contact to Dr. Schaefer was to obtain additional information

concerning allergic reactivity to formaldehyde, whether or not it could be tested for, and how it

may be accommodated.

　　　Based on Dr. DeMarco's conversation with Dr. Schaefer, she learned that it would be

appropriate for Plaintiff to use a professionally fitted PAPR (positive air pressure respirator) to

mitigate and avoid exposure. Dr. DeMarco also learned that reactivity to formaldehyde is irritant in nature, and was not damaging, life threatening, nor would it cause anaphylaxis and that reactivity to formaldehyde could be mitigated. After Dr. DeMarco received the Christiani Note and the Zheng Note, she and Plaintiff scheduled a meeting for November 14, 2014, at 3:30 p.m. to discuss this documentation. At 3:13 p.m. that day, Plaintiff canceled the meeting with Dr. DeMarco.

After reviewing the Zheng and Christiani Notes, the AAC determined that it was necessary to speak with Dr. Zheng and Dr. Christiani to obtain additional information, as well as get clarification on certain aspects of their notes. Needing his permission to do so, Dr. DeMarco notified Plaintiff that the AAC needed his written permission to speak with Dr. Zheng and Dr. Christiani.

Plaintiff was evaluated by Dr. Christiani on October 23, 2014.  However, the Christiani Note did not contain the date on which he saw Plaintiff nor did provide the date it was written. The Christiani Note incorrectly states that Plaintiff suffered "formalin exposures in the anatomy lab at UMASS Medical School." Plaintiff had not been exposed to formaldehyde in the anatomy lab the Medical School. Plaintiff conceded that this was a "pretty big misunderstanding by Dr. Christiani." The Christiani Note otherwise lacks the date of service, Plaintiff's prior medical history, a diagnosis, the symptoms Plaintiff experienced, the severity of his symptoms, the nature of his reactivity and whether Plaintiff's reactivity is contact based or inhalant based. In his note, Dr. Christiani opined that Plaintiff "cannot do usual dissection on cadavers treated with formalin, even with respirator in place," but did not indicate provide an explanation as to why he believed that to be true. The Christiani Note invited the Medical School to contact him with questions.

*The Zheng Note*

The historical documentation referenced by Dr. Zheng in the Zheng Note were letters prepared in 2014 at Plaintiff's request by two physicians, Dr. Ravi Nath and Dr. Akansha Jha, concerning their evaluations of Plaintiff's asserted reactivity to formaldehyde in 2011. Dr. Nath was Plaintiff's uncle, and lived in England. Dr. Jha was a distant relative of Plaintiff, and lived in India. Plaintiff initially testified that Dr. Nath and Dr. Jha would evaluate him through Skype calls or phone calls. Plaintiff testified that he understood that the Medical School requested copies of the notes from Drs. Nath and Jha but declined to do so, feeling that it was "unreasonable."

The AAC determined that Dr. DeMarco needed to follow up with Dr. Christiani with questions about the Christiani Note that were necessary for the AAC's evaluation of Plaintiff's request for an academic accommodation. This included when Plaintiff was evaluated, what the diagnosis was, whether he had reviewed the safety data sheets for the materials used in the embalming process at the Medical School, as well as myriad others related to Plaintiff's alleged reactivity to formaldehyde and the accommodations the Medical School had offered. Dr. DeMarco asked for Plaintiff's permission so that she could speak directly with Dr. Christiani concerning the Christiani Note and the questions the AAC had. Plaintiff refused to give permission to the Medical School.

Plaintiff Meets with the Associate Dean of Student Affairs – Fall of 2014

During the 2014-2015 academic year, Dr. Michael Kneeland served as the Interim Associate Dean of Student Affairs at the Medical School, working in the Office of Student Affairs. The major goal of the Student Affairs Office is to provide advocacy for and support to medical students as they pursue their medical degrees. At Plaintiff's request, Dr. Kneeland met

with him several times during the fall 2014 semester in his capacity as Interim Associate Dean, including on October 3, October 7, October 16, and November 14.

As Interim ADSA, one of the primary functions of Dr. Kneeland's role was to provide support to, and advocate for, medical students. At the time, Dr. Kneeland was aware that Plaintiff was pursuing academic accommodations for his asserted reactivity to formaldehyde with the AAC. Plaintiff generally expressed concerns with this process to Dr. Kneeland, and believed that some of the information the AAC was requesting was not necessary. Dr. Kneeland explained this process to Plaintiff, and encouraged Plaintiff to follow the AAC's requests.

November 2014 AAC Request

On November 26, 2014, Dr. DeMarco sent Plaintiff a letter summarizing the details of, and updating Plaintiff on, the status of his request for accommodations. Plaintiff had not contacted Dr. DeMarco since he canceled their scheduled meeting on November 14, 2014.  In the letter, the AAC asked Plaintiff for the following information:  1. medical records referenced in Dr. Zheng's letter; 2. dates of office visits that you had with both Dr. Zheng and Dr. Christiani; 3. original letters from these physicians sent directly to me from their offices, and your written permission for me to speak with these physicians. Dr. DeMarco asked Plaintiff to schedule a meeting with her "as soon as possible" by calling her office or emailing her directly. Plaintiff did not contact Dr. DeMarco after receiving the November 26, 2014 letter, nor did he provide any of the requested information.

On December 10, 2014, Dr. DeMarco received a letter from Attorney Nicholas Gomes, Esq. on behalf of Plaintiff. Dr. DeMarco responded by sending a letter to Plaintiff, with a courtesy copy to Attorney Gomes. The December 12th letter reiterated the need for Plaintiff to provide the information that the AAC had previously requested on November 26th so that it could

rule on Plaintiff's request for an accommodation. Dr. DeMarco also noted in the December 12th letter that once the AAC received the documentation it requested and had the ability to consult with his doctors, it would be able to move forward. Plaintiff did not meet with, call or email Dr. DeMarco after receiving the December 12th letter.

Plaintiff retained a second attorney, Edward Prisby, Esq. who wrote to the Medical School on January 6, 2015. Atty. Prisby provided copies of the Zheng and Reyes Notes and a letter dated October 23, 2014 from Dr. Christiani on different letterhead. On February 12, 2015, Peter Michelson, Esq., an attorney at the University of Massachusetts Office of the General Counsel, sent a written response to Attorney Prisby. Plaintiff did not communicate with the AAC again until November 2016.

Plaintiff's Academic Performance

Except for the dissection on October 25, 2014, Plaintiff did not participate in any of the anatomy lab dissections during the 2014-2015 academic year. Because of the time he missed in the anatomy lab, Plaintiff was unable to achieve a passing grade for DSF for the 2014-2015 academic year. The BSAEB had a regularly scheduled meeting December 8, 2014, which Dr. Kneeland attended, and discussed Plaintiff's academic progress. Given that it was impossible for Plaintiff to achieve a passing grade in DSF for the 2014-2015 academic year, the best possible outcome for him was to withdraw from DSF to ensure that he did not fail the course. In light of the fact that Plaintiff was no longer able to achieve a passing grade in DSF, the BSAEB requested that Plaintiff's mentor, Dr. Philip Fournier, inform Plaintiff of his academic situation and advise him that it was in his best interests to withdraw from DSF. Dr. Fournier met with Plaintiff on December 9, 2014 to discuss it.

As interim ADSA, Dr. Kneeland also wanted to meet with Plaintiff to follow-up on the discussion that he had with Dr. Fournier about withdrawing from DSF, and to plan Plaintiff's academic calendar going forward. Dr. Kneeland emailed Plaintiff on December 29, 2014, and Plaintiff replied the following day to say he would follow up with him to set up an appointment after the New Year. As of January 17, 2015, Dr. Kneeland had not yet heard from Plaintiff to schedule a meeting. Dr. Kneeland emailed Plaintiff again reminding him that they needed to meet and explained to him the reasons why. Plaintiff responded four days later that he had not been feeling well, but would follow up as soon as possible.

On January 28, 2015, Plaintiff informed Dr. Kneeland that he had the flu, and would follow-up when he felt better. As of February 7, Dr. Kneeland had not heard from Plaintiff to schedule a meeting.  As a result, Dr. Kneeland reached out to him once more. Dr. Kneeland received no response from Plaintiff. Pursuant to the Student Handbook, medical students are allowed to withdraw from a course in FOM1 up to two weeks before the final exam or end of the course. As the last day of the DSF course was February 24, 2015, and Dr. Kneeland did not want Plaintiff to have a failing grade for the DSF course, he emailed Plaintiff *again* on February 12, 2015 to advise him of the foregoing and to ask Plaintiff to let him know if he would like to withdraw from DSF, as the decision was ultimately his. Plaintiff withdrew from DSF on February 12, 2015. After Plaintiff withdrew from DSF, he and Dr. Kneeland still needed to meet to begin planning how to incorporate DSF into his schedule in the following academic year. Dr. Kneeland emailed Plaintiff about this on February 14, 2015.

As of March 26, 2015, Plaintiff had not contacted Dr. Kneeland to schedule a meeting. As a result, Dr. Kneeland sent him another message. Plaintiff informed Dr. Kneeland on March 31 that he would schedule a time to meet but did not do so. On May 11, 2015, the BSAEB held a

regular meeting that Dr. Kneeland attended. Dr. Kneeland advised the BSAEB of his repeated attempts to meet with Plaintiff.

Pursuant to the Student Handbook, FOM1 medical students must complete all required FOM1 courses in order to progress to the second year of medical school, FOM2. In light of the fact that Plaintiff did not complete DSF, the BSAEB voted that Plaintiff would not be allowed to progress to FOM2. Since the BSAEB's decision was considered an "adverse recommendation," Plaintiff was required to appear before the Progress Board. On May 15, 2015, Dr. Kneeland prepared and sent a letter to Plaintiff advising him of the BSAEB's decision, and the fact that this matter was being referred to the Progress Board for review. Dr. Kneeland's letter also advised Plaintiff to review the Progress Board process in the Student Handbook and asked Plaintiff to schedule a meeting with him to discuss this process.

Dr. Kneeland also knew that Plaintiff had requested, but had not yet completed the process of applying for, academic accommodations. Dr. Kneeland knew that the AAC was not able to rule on Plaintiff's request for an academic accommodation because he had not provided documentation requested by the AAC. Dr. Kneeland advised Plaintiff that, if the process of applying for academic accommodations was resolved, he would help him develop an academic schedule for fall 2015, pending a decision of the Progress Board. To assist in that process, Dr. Kneeland asked Plaintiff to bring the last correspondence Plaintiff received from the AAC. Dr. Kneeland met with Plaintiff on May 28, 2015. Plaintiff did not bring the last correspondence from the AAC. Plaintiff also did not provide Dr. Kneeland with any specifics when Dr. Kneeland asked him several times what documents the AAC said he was missing. Dr. Kneeland offered to personally drive Plaintiff to a physician's office or to pay for any notes Plaintiff needed if he was lacking financial resources, but Plaintiff did not accept his offers.

Dr. Kneeland's role as Interim ADSA would end on June 1, 2015, and Dr. Sonja Chimienti was taking over the position. Plaintiff would need to meet with Dr. Chimienti to discuss setting up a Progress Board meeting in light of the BSAEB's vote that Plaintiff would not be allowed to proceed to SOM2. On June 4, 2015, Dr. Chimienti emailed Plaintiff to introduce herself and to schedule a time within the next week to meet or speak with Plaintiff via telephone. Plaintiff and Dr. Chimienti ultimately met on June 19. During their meeting, Dr. Chimienti advised Plaintiff on the process before the Progress Board. Dr. Chimienti also directed Plaintiff to the Student Handbook, which outlined the process before the Progress Board in great detail.

Dr. Chimienti informed Plaintiff that she was available several dates at the end of July for possible dates for the meeting of the Progress Board. Plaintiff replied on June 23 that he would send Dr. Chimienti an email with a requested time in "the next few days" and that he would also "in the meantime" try to see if the Progress Board might be requested earlier. As of July 4, 2015, Dr. Chimienti had not heard from Plaintiff concerning a date for the Progress Board meeting. Given the fact that Dr. Chimienti had not heard from Plaintiff since June 23, and the fact that she needed to lock in a date for the Progress Board meeting before the start of the 2015-2016 academic year, she scheduled the Progress Board meeting for July 29, 2015. Dr. Chimienti advised Plaintiff of the date for the Progress Board meeting on July 4, 2015 via email.

The Progress Board Meeting on July 29, 2015

Pursuant to the Student Handbook, Plaintiff was permitted, but not required, to appear personally before the Progress Broad. Dr. Chimienti advised Plaintiff of his right to appear before the Progress Board on July 4, 2015 via email. Plaintiff was required to appear before the Progress Board, however, in light of the fact that he withdrew from DSF in February 2015.

The Progress Board was not responsible for, nor did it have the authority to, provide Plaintiff with an academic accommodation for completing DSF. Academic accommodations

could only be provided by the AAC. The Progress Board was responsible only for reviewing the BSAEB's recommendation that Plaintiff not be promoted to FOM2 and then making a recommendation to the Dean of the Medical School, Terrence R. Flotte concerning Plaintiff's status as a medical student.

The Progress Board met on July 29, 2015 to discuss the BSAEB's recommendation. At the outset of the meeting, Dr. Chimienti summarized for the Progress Board the reason why Plaintiff was being presented for consideration. Plaintiff appeared for a portion of the meeting and met with Dr. Chimienti following the meeting. Plaintiff informed Dr. Chimienti that he found the meeting to be congenial and that the environment was supportive.

The Progress Board Recommends That Plaintiff Be Provisionally Promoted to FOM2

On August 4, 2015, the Progress Board recommended to Dean Flotte that Plaintiff be provisionally promoted to FOM2, with the additional requirement that he complete the anatomy lab requirements for DSF by the end of Fall 2015 academic term. In light of the Progress Board's recommendation, Plaintiff was permitted to join his FOM2 class on August 6, 2015, and attend all classes and all components of FOM2, with all second-year students. On August 4, 2015, Dr. Chimienti advised Plaintiff of the Progress Board's recommendation and his ability to begin FOM2 classes on August 6, 2015. Plaintiff responded to Dr. Chimienti's email on August 5, 2015 acknowledging receipt, and thanking Dr. Chimienti for her "kind email" and "kind support."

Following receipt of the Progress Board's recommendation, Dr. Chimienti needed to prepare a formal correspondence to Plaintiff outlining the Progress Board's specific conditions for his promotion to FOM2. Dr. Chimienti advised Plaintiff in her August 4, 2015 email that she would be sending him a formal correspondence outlining the specifics of the Progress Board's

decision. On August 5, 2016, Dr. Chimienti met with the course leaders of the FOM2 classes for

the purpose of preparing Plaintiff's curriculum plan for the year. For the 2015-2016 academic

year, Plaintiff would be enrolled in all FOM2 classes, as well as the DSF anatomy lab session.

On or about August 6, 2015, Prof. Gilroy was notified that the Progress Board

recommended to Dean Flotte that Plaintiff be provisionally promoted to FOM 2. After reviewing

the Progress Board's recommendation, Prof. Gilroy was concerned that the requirement that

Plaintiff complete the anatomy lab component of DSF by the end of fall semester 2015 was not

feasible given that the DSF course is regularly scheduled to run from late September through the

end of February. Dr. Chimienti communicated Prof. Gilroy's concern to Dean Flotte. Dean Flotte

approved Prof. Gilroy's proposed amendment to the Progress Board's recommendation, and

permitted Plaintiff until the end of February to complete DSF. However, Plaintiff testified that he

believed that forcing him to take certain aspects of the DSF course as a condition to his

promotion to FOM2 during the fall 2015 academic term was "extra coursework" and considered

it discriminatory.

On August 19, 2015, Dr. Chimienti prepared a letter to Plaintiff to inform him that

Dean Flotte had approved the Progress Board's recommendation concerning Plaintiff's

advancement to FOM2. This letter was sent to Plaintiff via email on August 21, 2015. The

Progress Board's recommendation that Plaintiff be promoted to FOM2, as approved by

Dean Flotte, was subject to the following conditions:

     a.   Plaintiff was granted provisional promotion to FOM2, pending resolution of
         his request for academic accommodations as it relates to his successful
         completion of the DSF course.

     b.   Plaintiff was required to complete the DSF anatomy lab requirements.  The
         details of the requirement needed to be worked out with the DSF Course
         Directors, with input of the AAC, as needed. Plaintiff was required to contact

the DSF instructors no later than September 15, 2015 to arrange for his participation in the anatomy lab coursework.

c.   In light of the fact that the AAC had requested additional information and documentation from Plaintiff, he needed to resolve the issue with the AAC.

The August 19th letter to Plaintiff advised him of these conditions. Plaintiff testified that he believes that Prof. Gilroy and Dr. Jonassen could have granted him academic accommodations, and that, in his mind, it was not necessary for him to meet with the AAC.

Neither Prof. Gilroy nor Dr. Jonassen had the authority to grant Plaintiff an academic accommodation. The August 19th letter makes clear that Plaintiff needed to resolve the issue with his request for academic accommodations with the AAC. On August 23, 2015, Dr. Chimienti advised Plaintiff to contact Prof. Gilroy and Dr. Jonassen by September 15, 2015, and that a quick email to set up a time would be a good idea. In response, Plaintiff informed Dr. Chimienti that he would "follow up with DSF faculty… as soon as possible."

Plaintiff did not contact Prof Gilroy and Dr. Jonassen until September 14, 2015 to schedule a time to meet. Due to previously scheduled professional commitments, Dr. Jonassen was not able to meet with Plaintiff until September 25. Dr. Jonassen and Prof. Gilroy worked together to plan Plaintiff's DSF experience so that he was only responsible for that portion of DSF involving gross dissection, which is the aspect of DSF that Plaintiff had not participated in during the 2014-2015 academic year (with the exception of the calf heart dissection on October 23, 2014). Prof. Gilroy and Dr. Jonassen developed a carefully orchestrated, thoughtful plan that would allow Plaintiff to complete the portions of DSF that he had not completed during the 2014-2015 year but ensure that he would not repeat those aspects of DSF that he already accomplished. In the absence of being granted an academic accommodation at this point, Plaintiff was responsible for the curriculum presented to him. Dr. Jonassen and Dr. Chimienti met with Plaintiff on September 25, 2015 to discuss the DSF curriculum. During their meeting,

Dr. Jonassen presented the curriculum that she and Prof. Gilroy had developed for Plaintiff to complete DSF.

For the 2015-2016 academic year, Dr. Jonassen and Prof. Gilroy instituted several changes in the lab component of DSF that they had discussed earlier that spring and summer.[6] The changes were intended to give students a fuller experience and focus their study on the most critical content during the anatomy lab. Plaintiff testified that he believed that Dr. Jonassen and Prof. Gilroy intentionally made changes to the DSF curriculum for the 2015-2016 academic year specifically to target him. In reality the changes were made to address a decline in student attendance in the anatomy lectures and labs due to access to online materials and to bolster the School's team-based approach to participating in the anatomy lab.

Dr. Jonassen and Prof. Gilroy adopted a rule that grade points would be subtracted for more than two unexcused absences in light of the foregoing concerns and to motivate students to attend the anatomy labs. Although the rules applied equally to all DSF students, Plaintiff believed Prof. Gilroy held Plaintiff to a higher standard because of these curriculum changes. Plaintiff testified that before these changes, students were permitted to "skip" the anatomy labs and simply take the exams.

On September 21, 2015, Dr. Chimienti emailed Plaintiff to remind him that he needed to follow-up with the AAC, pursuant to the Progress Board's requirements for his promotion to FOM2. On September 25, 2015, Dr. Chimienti again advised Plaintiff that he needed to contact Dr. DeMarco to discuss his request for academic accommodations. On October 15, 2015, Dr.

---

[6]The specific changes included: the traditional anatomy lab practical exam would make up only 60% of the lab grade for each block; the remainder of the grade for each block would be earned through pre-lab quizzes, additional quizzes focused on dry lab material and interactive functional anatomy and simulation based exercises done in small group settings; and lab attendance would be required of all students, and although no points were awarded for attendance, grade points would be subtracted for more than two unexcused absences.

Chimienti asked Plaintiff whether he had met with Dr. DeMarco regarding his accommodation request. Dr. Chimienti reminded Plaintiff that resolving the issue with his academic accommodations was a condition for his promotion to FOM2. Plaintiff did not respond.

As October 20, 2015, Plaintiff had not responded to Dr. Chimienti, so she again asked him whether he had reached out to the AAC. On October 28, 2015, Plaintiff responded that he was "consulting with [his] family and counsel…." Plaintiff did not contact Dr. DeMarco, or any other member of the AAC, during the fall 2015 semester. Plaintiff thus failed to comply with the condition set by the Progress Board for his provisional promotion to FOM2.

As of mid-October 2015, Plaintiff had not attended the two dissection labs, nor had he taken either of the first two pre-lab quizzes. Prof. Gilroy advised Plaintiff via email on October 15, 2015 of her concern and the consequences of him not attending the dissection labs. Dr. Chimienti contacted Plaintiff after learning from Prof. Gilroy about Plaintiff's non-participation. Dr. Chimienti wanted to meet with Plaintiff to help him through the process. Plaintiff missed another pre-lab quiz and lab on October 18, 2015 and October 19, 2015, respectively. Given that Plaintiff had not attended any of the anatomy labs, nor taken any of the pre-lab quizzes, Prof. Gilroy added Plaintiff to the list of students to discuss at the next BSAEB meeting, which was scheduled for October 26, 2015. Given Plaintiff's non-participation in the DSF anatomy labs, Prof. Gilroy believed that it was very unlikely Plaintiff would be able to pass DSF during the 2015-2016 academic year.

On October 26, 2015, the BSAEB met for its regular meeting and discussed Plaintiff, among other students. The BSAEB concluded that Plaintiff was not meeting the conditions it placed on Plaintiff's promotion to FOM2. In particular, the BSAEB determined that Plaintiff had not contacted the AAC to resolve his request for academic accommodations relating to

completing DSF, nor was he successfully completing the anatomy lab component of DSF. In light of its findings, the BSAEB unanimously voted that Plaintiff should not continue in FOM2. The BSAEB's decision was considered an "Adverse Recommendation" and therefore would go to the Progress Board. Plaintiff believed that being required to go before the Progress Board was discriminatory and retaliatory.

On October 29, 2015, Dr. Chimienti sent Plaintiff a letter apprising him of the BSAEB's decision and the notifying him of the need to schedule a meeting to discuss the timing of the Progress Board meeting. Dr. Chimienti's letter further advised Plaintiff to review the Progress Board process in the 15/16 Student Handbook.[7] Plaintiff and Dr. Chimienti met on November 9, 2015.  At this point, Plaintiff still had not contacted the AAC pursuant to the Progress Board's directive earlier in the summer.  Dr. Chimienti strongly encouraged him to meet with the AAC and to do so prior to the Progress Board meeting.

Dr. Chimienti also needed to know Plaintiff's availability for a meeting of the Progress Board in the few weeks after November 9. Dr. Chimienti was sensitive to Plaintiff's academic obligations, including his exam schedule, so she asked Plaintiff via email on November 9 to send her 3-4 dates and asked Plaintiff to respond no later than November 13, 2015. Dr. Chimienti and Plaintiff met on November 9 and also discussed the possibility of taking anatomy at a different medical school. While Plaintiff felt that Dr. Chimienti held him to a higher standard because she told him that he should try to find his own accommodation, it was Dr. Chimienti's opinion that it could not hurt to research what other medical schools have available, and, if Plaintiff found something, to propose an alternative.

---

[7]   The process of the Progress Board in the 2015-2016 Medical School Student Handbook (the "15/16 Handbook") was the same as the Student Handbook (i.e. the 2014-2015 Medical Student Handbook.

On November 18, 2015, Plaintiff indicated that he preferred to have the Progress Board meeting held in early January, despite Dr. Chimienti's request. The Progress Board could not be held in January because the BSAEB's recommendation needed to be resolved before the start of the 2016 spring semester. Moreover, a January date for the Progress Board would have been nearly two months after their initial meeting on November 9, 2015. As a result, on November 18, 2015, Dr, Chimienti informed Plaintiff that the Progress Board needed to meet in December, and asked him to provide her with a few dates for the meeting in December and gave him two days to reply. Plaintiff did not respond to Dr. Chimienti with any dates by November 20, so on November 25, 2015, Dr. Chimienti identified five possible dates at various times during the day between December 10 and December 22 for the Progress Board meeting. Dr. Chimienti informed Plaintiff of these dates via email and asked him to rank these dates in order of priority.

After emailing Plaintiff with these dates, Dr. Chimienti also provided these dates to members of the Progress Board on November 25, who ultimately selected December 16th for the meeting. Dr. Chimienti notified Plaintiff of the date for the Progress Board meeting on Friday, November 27. Plaintiff asked that the meeting be delayed until December 22, however the members of the Board chose not to extend the date because such a late date would not give them ample time to meet and provide a decision to Plaintiff prior to the start of the spring term.

Dr. Chimienti wanted to meet with Plaintiff to help him prepare and to support him through the upcoming Progress Board meeting. Dr. Chimienti set aside 10 blocks of times in December to meet with Plaintiff and offered the dates to Plaintiff on December 3, 2015. Plaintiff did not respond to Dr. Chimienti's offer to meet with him.

Second Meeting of The Progress Board

The Progress Board meeting was held on December 16, 2015. Plaintiff was offered several options for the timing of the meeting, and testified that he believed that setting the Progress Board meeting for December 16, 2015 was discriminatory because it caused him to miss time studying for his exams. At the Progress Board meeting, Dr. Chimienti reviewed the BSAEB's Adverse Recommendation that Plaintiff not be permitted to continue with FOM2 in light of the fact that he had not complied with the conditions set by the Progress Board in July 2015; provided members with background information regarding the Adverse Recommendation, including information about the DSF course; Plaintiff's progress in FOM2; and the prior Progress Board Recommendation from July 29, 2015. Plaintiff appeared before the Progress Board for a portion of the time and was given the opportunity to address the members.

On January 5, 2016, the Progress Board recommended to Dean Flotte that Plaintiff not continue with the FOM2 coursework/curriculum.  The following reasons were cited:

> a.      Plaintiff did not fulfill the Progress Board's prior stipulation that he successfully complete the DSF anatomy lab requirement, working with the AAC and the DSF course directors.
>
> b.      Plaintiff did not work with the AAC to resolve the AAC's outstanding requests in connection with his request for a reasonable accommodation.

The Progress Board further decided that when Plaintiff had fulfilled the requirements set for him in August 2015, with accommodations as granted by the AAC, he would have the opportunity to appear before the Progress Board again to confirm that he had met the criteria for readmission. Dr. Chimienti informed Plaintiff of the Progress Board's decision on January 6, 2016. Dr. Chimienti met with Plaintiff on January 7, 2016. During their meeting, Plaintiff requested that Progress Board's decision be overturned by Dean Flotte. Plaintiff requested a meeting with Dean Flotte, and asked that Dr. Chimienti be present for that meeting.

On January 14, 2016, Plaintiff met with Dean Flotte to discuss the Progress Board's decision, with Dr. Chimienti present at this meeting. Dean Flotte ultimately approved the Progress Board's recommendation. On January 15, 2016, Dr. Chimienti sent Plaintiff a letter informing him of Dean Flotte's decision and offered Plaintiff the opportunity to meet with her to discuss it. Plaintiff informed Dr. Chimienti that he would follow up with her as soon as possible. Plaintiff was placed on an administrative leave of absence from the Medical School, effective January 19, 2016. Plaintiff testified that he believed the Progress Board's decision to force him on a leave of absence was discriminatory and retaliatory.

Leave of Absence

The Spring 2016 semester at the Medical School began on January 4, 2016. As Plaintiff's administrative leave of absence did not technically begin until January 19, 2016, Plaintiff was considered to have been actively enrolled at the Medical School during this 15-day period. According to the Medical School's policy, when a student enters a leave of absence after the start of an academic semester, the tuition and fees charged to the student and the federal student loan disbursed to the student need to be adjusted based on the student's attendance in the semester. The Bursar, Yi Chen, was not privy to any of the facts or circumstances relating to the reason Plaintiff was on an administrative leave of absence and working with the Medical School's Office of Financial Aid, calculated that Plaintiff's outstanding balance owed to the Medical School was $2,447.49. This amount represented Plaintiff's tuition and fees between January 4, 2016 and January 19, 2016. A bill reflecting Plaintiff's outstanding balance was sent to him on January 22, 2016.

The 2015-2016 Student Handbook contained a "Billing and Policy on Past Due Student Accounts." The Past Due Student Accounts Policy provides that a student's failure to pay his or

her account in full by the due date may result in denial of transcripts. Because as of February 12, 2016, the Medical School had not received payment from Plaintiff of his outstanding $2,447.49 balance, Ms. Chen requested that the Registrar's Office at the Medical School place a hold on Plaintiff's transcript until his account was paid in full. As of this time, Ms. Chen was not aware of the facts or circumstances relating to the reason Plaintiff was on an administrative leave of absence. Plaintiff believed that Dr. Chimienti directed Ms. Chen to place a hold on his transcript, that this action was discriminatory, and that it was done intentionally to prevent him from transferring.

Email Policy

The 2015-2016 Student Handbook contains an Electronic Mail, Internet Access Policy. The Email Policy provides that e-mail is considered an official means of communication at the Medical School and contains certain provisions regarding response times and attention to accounts for important school-related matters. Although Plaintiff was expected to be familiar with the E-Mail Policy regardless of whether he decided to read it, Plaintiff was specifically advised of the Email Policy by Dr. Chimienti on August 21, 2015. Plaintiff's failure to timely respond to emails was noted as a concern throughout the accommodation progress.

Attendance at Classes

The 2015-2016 Student Handbook also contains an Attendance, Rescheduling, and Withdrawing Policy.  The Attendance Policy states that "students are expected to meet all course activities and requirements as scheduled within the medical school curriculum."  As part of Plaintiff's FOM2 curriculum, Plaintiff was required to enroll in Determinants of Health 2 (DOH2), which included a Population Health Clerkship. Plaintiff failed to attend the orientation of the Population Health Clerkship, and his absence was not excused. Plaintiff was advised of his failure to attend this meeting. As part of Plaintiff's FOM2 curriculum, Plaintiff was required to

30

enroll in Organ Systems Disease (OSD). Plaintiff failed to attend 6 of the 7 small group sessions of OSD focusing on the endocrine system, and he did not remediate these sessions. Plaintiff also failed to attend a small group session concerning musculoskeletal medicine and dermatology.

<u>Taking Anatomy at a Different Medical School</u>

After their email exchange in late January 2016, Plaintiff did not contact Dr. Chimienti again until he emailed her on July 29, 2016. Plaintiff informed Dr. Chimienti that he had received an offer from Dr. Robert Spears, an Associate Dean of Academic Affairs at the University of Texas School of Dentistry to "personally supervise" his anatomy coursework. This was the first time that a medical student at the Medical School had developed a proposal to take anatomy at a different medical school, for which he would receive credit at the Medical School. In light of the fact that this had not been done before, Dr. Chimienti initially determined that the Medical School would need to develop a process to review and approve Plaintiff's proposal.

Dr. Chimienti contacted Dr. Melissa Fischer, who at the time worked for the Medical School as its Associate Dean for Undergraduate Medical Education. Plaintiff believed it was inappropriate for Dr. Chimienti to contact Dr. Fischer, however Dr. Fischer oversaw the operations of the undergraduate medical curriculum at the Medical School. Dr. Chimienti did not provide any information to Dr. Fischer beyond the emails Plaintiff sent to her, and the communication he received from Dr. Spears and another physician from Columbia University School of Dentistry had Plaintiff contacted.

After emailing Dr. Fischer, Dr. Chimienti spoke with Dr. Hines concerning Plaintiff's proposal. As Co-Chair of the AAC, Dr. Hines believed that Plaintiff's proposal should be handled by the AAC because, ultimately, his proposal was a request for an academic accommodation, to substitute course work for medical reasons. Dr. Hines informed Dr.

Chimienti of her beliefs. Plaintiff testified that he believed Dr. Hines held him to a higher

standard by recommending this approach.

Dr. Chimienti subsequently contacted Dr. Fischer to apprise her of Dr. Hines' suggestion.

Dr. Fischer agreed that it was appropriate for Plaintiff's proposal to proceed through the AAC.

On August 6, 2016, Dr. Chimienti advised Plaintiff to contact Dr. DeMarco. On August 12,

2016, Plaintiff instead emailed Dr. Fischer directly about the offer from Dr. Spears, who was

unable provide Plaintiff an accommodation to substitute coursework.

Plaintiff Contacts the AAC in November 2016

Plaintiff did not communicate with the AAC between January 2015 and November 2016.

In November 2016, Dr. Dawn Carpenter, a member of the AAC, received a letter by fax from a

physician on behalf of Plaintiff. Dr. Carpenter checked with Dr. DeMarco in case the letter was

something she needed to see. Dr. DeMarco, after learning that it was documentation from a

pulmonologist at MGH, remarked: "Oh boy- yeah, I need to see that." Plaintiff testified at

deposition that he believed Dr. DeMarco's comment was discriminatory. Dr. DeMarco made this

statement because she thought that Plaintiff had finally followed through with the AAC's long-

standing request for information and documentation.

Plaintiff's Evaluation by Dr. Harris

In early November 2016, Dr. Chimienti received a fax from Dr. Scott Harris on behalf of

Plaintiff containing documentation supporting Plaintiff's request for an academic

accommodation. As the OSA did not handle accommodations requests, Dr. Chimienti forwarded

the documentation she received to the AAC on December 1, 2016 (the "Harris Note"). Plaintiff

was seen by Dr. Harris, a family health care practitioner, on October 31, 2016. Dr. Harris is not

an allergist or occupational health physician. Plaintiff testified that he visited Dr. Harris "as a way to satisfy the Medical School's accommodation requests.

Dr. Harris incorrectly believed that Plaintiff had a reaction to formaldehyde in the anatomy lab "about 2 years ago." Plaintiff believes he showed the letters from Dr. Zheng and Dr. Christiani to Dr. Harris. Plaintiff does not recall providing Dr. Harris with the chemical data sheets from BU or the Medical School. Plaintiff's attorney at the time, Whitfield Larabee , not Dr. Harris, drafted the second page of the Harris Note before Dr. Harris had the opportunity to evaluate Plaintiff. The Harris Note does not contain an independent discussion of the characteristics, symptoms, or duration of Plaintiff's reactivity to formaldehyde or the severity of Plaintiff's symptoms.  The Harris Note refers back to the Christiani and the Zheng Notes and does not indicate whether he reviewed Plaintiff's historical medical records regarding his prior treatment for his reactivity to formaldehyde, including records from a treating physician. The Harris Note does not describe the course of Plaintiff's reactivity, or any related treatment Plaintiff may have received since his initial exposure.

After reviewing the Harris Note, the AAC determined, in good faith, that it was necessary to speak with Dr. Harris to obtain additional information from him. Knowing that she needed Plaintiff's permission to do so, Dr. DeMarco advised Plaintiff of her need for Plaintiff's written permission to speak with Dr. Harris. The AAC determined that Dr. DeMarco needed to ask certain questions, which were necessary for the AAC's evaluation of Plaintiff's for an academic accommodation. Specifically, Dr. DeMarco wanted to ask Dr. Harris of his qualifications to opine on reactivity to formaldehyde, given his status as a family care practitioner, whether he made a diagnosis of Plaintiff, whether the reaction to formaldehyde was an allergy or an irritant, whether the reactivity is contact based or inhalant based or both, and whether Dr. Harris had

spoken with Drs. Zheng or Christiani about their evaluations if he was relying on them. The

AAC also had questions about Dr. Harris's rationale for believing that a hazmat suit and

respirator were not an acceptable option, among other things. Plaintiff testified that it would be

"completely… unreasonable and inappropriate for the Medical School to glean

any…information, other than the letter that… he has given to them." Plaintiff testified that it was

"unreasonable" for Dr. DeMarco to ask Plaintiff for permission to speak with Dr. Harris so that

she could learn a bit more information concerning Dr. Harris's evaluation and he refused to

provide the Medical School with permission to speak with Dr. Harris.

Plaintiff Requests an Academic Accommodation

On December 9, 2016, Plaintiff sent a letter to Dr. Carpenter. Plaintiff enclosed with the

December 9, 2016 letter the note he previously sent through Attorney Prisby from Dr. Christiani,

the Harris Note that Dr. DeMarco previously received, and a note from Dr. Zheng (the "2016

Zheng Note"). [8]

In the December 9 letter, Plaintiff wrote:

With regard to the requests of the University of Massachusetts Medical School to review
other medical records and history, or to speak directly with my physicians, this goes
beyond what is required of me under state and federal anti-discrimination laws, is a
requirement that violate these laws, and amounts to a request to engage in an unwarranted
invasion of my privacy. The materials that I have provided adequately establish my
disability and my need for accommodation.

On December 21, 2016, the AAC met, in part, to discuss the December 9, 2016 letter

from Plaintiff (along with the enclosed letters from the physicians). The AAC unanimously

agreed that it did not have enough documentation to review Plaintiff's request for

---

[8] The 2016 Dr. Zheng was slightly different from the first Zheng Note provided in November 2014. Specifically,
2016 Zheng Note did not contain the following language that was included in the 2014 Zheng Note: "I have
reviewed Plaintiffs (sic) previous medical recordin (sic) detail.  It was clearly documented that…" The 2016 Zheng
Note also did not identify the date she evaluated Plaintiff.

accommodations. The AAC agreed that it needed records from Plaintiff's treating physician who witnessed his original asserted reaction to formaldehyde at BU. The AAC further determined that the letters provided were based on Plaintiff's accounting of his reaction, and that none of the letters he provided on December 9, 2016 stated that they reviewed Plaintiff's medical records documenting the asserted reaction from the initial treating physician and that it needed Plaintiff's permission to speak to these physicians. The AAC also determined that it needed information that would identify Plaintiff's functional impairments and how the Medical School could best address them.

<u>The AAC Responds to Plaintiff's Request</u>

On January 6, 2017, Dr. DeMarco sent Plaintiff a letter, in part, to update him on the AAC's decision from its meeting on December 21, 2016, and because she wanted to specifically articulate for Plaintiff the additional information that the AAC determined it needed to rule on his request. Consistent with the AAC's prior requests to Plaintiff beginning in October 2014, Dr. DeMarco, requested Plaintiff provide the following information to the AAC: medical records from the physician or hospital who treated Plaintiff during the allergic reaction to formaldehyde; documentation from Plaintiff's regular allergist or primary care physician of the specific nature of the allergy and route of exposure (inhalation vs. contact), and the nature and extent of any follow-up treatment following that acute reaction episode and up through and including the present time; and Plaintiff's written permission to speak with Drs. Christiani, Zeng and Harris concerning the specific nature of your allergy, his prior and current history of medical treatment for this allergy, the route of exposure, and whether or not our offer of a full hazmat gear would mitigate the reaction.

Plaintiff testified that he understood that the January 6, 2017 letter informed him that the AAC needed additional information to rule on his request for an academic accommodation. On

February 3, 2017, James G. Healy, the Associate Vice Chancellor for Management at the Medical School at the time, sent an email to Plaintiff and Attorney Larrabee. Mr. Healy's email was sent in response to a letter the Medical School received from Attorney Larrabee on January 24, 2017 in which he attempted to "appeal" Plaintiff's ongoing request for an academic accommodation. Plaintiff's "appeal" was premature because the AAC had not yet rendered a decision on Plaintiff's request for an accommodation. Mr. Healy informed Plaintiff and Attorney Larrabee of this fact on February 3, 2017. In his February 3, 2017 email, Mr. Healy also reiterated the requests of the AAC that had been previously made by Dr. DeMarco in her January 6, 2017 letter to Plaintiff.

Plaintiff was given until February 17, 2017 to provide the information and permission to contact his doctors as set forth in the letter of January 6, 2017 from the AAC. If Plaintiff did not provide the requested information and documentation by Friday, February 17, 2017, the AAC was prepared to meet to discuss and deliberate on Plaintiff's accommodation request with the information and materials that it had in its possession as of that time. Plaintiff did not submit anything to the AAC in response to Mr. Healy's email beyond what he had previously provided.

<u>The AAC Meets to Discuss Plaintiff's Request</u>

On March 1, 2017, the AAC met to discuss Plaintiff's request for an academic accommodation and the documentation that Plaintiff had submitted to the AAC to date and decided unanimously that the documentation Plaintiff submitted was insufficient to determine the specific nature of Plaintiff's alleged disability and, therefore, what type of accommodation the Medical School could provide to Plaintiff.

The AAC made its decision because of the following findings:

a.      It was not given the opportunity to review the records from Plaintiff's initial alleged reaction to formaldehyde, and therefore it did not have firsthand knowledge of the specific reaction Plaintiff may have suffered.

b.      It was not provided the opportunity to speak with any of Plaintiff's treating physicians to inquire as to the specific nature and severity of his alleged allergic reaction, the prior and current history of medical treatment for his allergy, the route of exposure, and why the AAC's offer of full hazmat gear with a respirator specifically fitted to Plaintiff would not mitigate his alleged reaction. The AAC was concerned that none of the treating physicians apparently examined him during his reaction, and instead appear to have based their opinion on the medical history he orally provided.

c.      The AAC believed it would have been very helpful to the AAC's consideration of Plaintiff's request if it spoke to Dr. Zheng because the first note she provided in 2014 (i.e., the Zheng Note) suggested she may have reviewed Plaintiff's medical records from his initial reaction, and, thus, could speak to what the treating provider observed.

The AAC informed Plaintiff of its decision in a letter to him, dated March 15, 2017 (the "Denial Letter"). Plaintiff testified that, while he doesn't explicitly recall receiving the Denial Letter, he believes he "must have" and understood that the AAC denied his request for an accommodation.

Plaintiff Appeals the AAC's Decision

Pursuant to its Policy, the AAC gave Plaintiff the opportunity to appeal its decision to the Academic Accommodations Appeals Committee (the "Appeals Committee"), the process for which was laid out for him in the Denial Letter. Plaintiff timely appealed the AAC's decision. On March 27, 2017, pursuant to the appeal process, Dean Flotte appointed Deborah Plummer, PhD, Jill Terrien, PhD, and Sheldon Benjamin, MD, to the Appeals Committee. All documents and materials concerning and relating to Plaintiff's accommodation request, including all relevant correspondence and emails, were forwarded to the Appeals Committee for its review and consideration on March 29, 2017.

The Appeals Committee met on April 6, 2017. Prior to commencing deliberations, and consistent with the Medical School's practices and protocols, Mr. Healy met with the Appeals Committee for approximately ten minutes. The purpose of Mr. Healy's meeting with the Appeals Committee was to go over the appeal policy and procedures, to make sure they understood the

task before them, and to answer any questions that the Appeals Committee had concerning the process. Mr. Healy did not engage in any substantive discussion of the matter when he met with them, and he left the meeting after accomplishing the reason for his attendance.

On April 6, 2017, the Appeals Committee upheld the decision of the AAC to deny Plaintiff's request for an academic accommodation. The Appeals Committee determined that the AAC acted in accordance with its policies and procedures. Mr. Healy advised Plaintiff on April 11, 2017 that the Appeals Committee upheld the decision of the AAC. Plaintiff testified that he was held to a higher standard than "all medical students" when he was not given an accommodation.

On December 12, 2017, Dr. Chimienti sent a letter to Plaintiff via registered mail to the address that the Medical School had on file for him (the "December 12 Letter"). Dr. Chimienti sent the December 12 Letter to Plaintiff because, at the start of the 2018 spring semester, Plaintiff was going to reach the maximum 2 year leave of absence from the Medical School. Pursuant to the 2017/2018 Student Handbook (the "17/18 Student Handbook"), the maximum leave of absence students may take is two years. The December 12 Letter advised Plaintiff of this fact. Dr. Chimienti further advised Plaintiff that, pursuant to Section 3 of the 17/18 Student Handbook, Academic Policies and Regulations:

> "A student who… fails to return from a Leave of Absence, in spite of notification by the Associate Dean of Student Affairs, will be considered to have withdrawn voluntarily from the Medical School and cannot be reinstated without positive action of the Committee on Admission."

The December 12 Letter requested that Plaintiff inform Dr. Chimienti of his intent to return to his studies, "either with Academic Accommodations granted by the Accommodations Committee, or without Accommodations."

The December 12 Letter requested that the Plaintiff contact Dr. Chimienti by December 31, 2017 with his plans.  Dr. Chimienti did not hear from Plaintiff by December 31, 2017. As a result, on January 3, 2018, Dr. Chimienti's assistant sent Plaintiff a copy of the December 12 Letter via email. Plaintiff responded on January 9, 2018, and informed Dr. Chimienti that he was "definitely interested in continuing [his] studies at the [Medical School]." To continue with his studies, Plaintiff needed to communicate with the AAC if he was still seeking accommodations for DSF, which Dr. Chimienti reminded Plaintiff of on January 9, 2018. Dr. Chimienti once again advised Plaintiff of this fact on January 9, 2018. Plaintiff requested to meet with Dr. Chimienti after receiving the December 12 Letter.

On January 9, 2018, Dr. DeMarco learned from Dr. Chimienti via email that Plaintiff wished to continue with his studies, and that he was directed to her by Dr. Chimienti for his accommodation requests for DSF. Dr. DeMarco subsequently forwarded Dr. Chimienti's email to Mr. Healy and, when she did, stated to him: "Here we go again." Plaintiff testified that Dr. DeMarco's comment was discriminatory.

On February 16, 2018, Plaintiff and Dr. Chimienti met to discuss his plans. At the meeting, Plaintiff informed Dr. Chimienti that he was considering seeking transfer to another institution or returning to the Medical School. Consistent with Dr. Chimienti's December 12 Letter and January 9 email exchange, Plaintiff needed to contact the AAC if he wanted to return to the Medical School with academic accommodations. Dr. Chimienti advised Plaintiff of this again during their meeting that day.

If Plaintiff wanted to rematriculate to the Medical School, he needed to request to return with or without academic accommodations by April 6, 2018. If Plaintiff wanted to return with academic accommodations relative to the DSF course, he needed to contact the AAC and comply

with its policy. Plaintiff needed to contact the AAC by April 6, 2018 if he wanted to pursue academic accommodations and needed to complete the process by July 1, 2018 so that there was sufficient time to bring his request to rematriculate to the Progress Board, consistent with the Progress Board's decision from December 16, 2015. If Plaintiff did not satisfactorily conclude this process (with or without ADA accommodations) by July 1, 2018, he would be considered to have voluntarily withdrawn from the Medical School pursuant to the 17/18 Student Handbook. On March 21, 2018, Dr. Chimienti sent a letter to Plaintiff (the "March 21 Letter") advising him of this information.

Plaintiff's Decision to Transfer

On March 16, 2018, Plaintiff informed Dr. Chimienti that he had "received the transfer application from South Carolina School of Medicine" and he requested that Dr. Chimienti provide him with a "letter of good standing." Dr. Chimienti advised Plaintiff by email on March 19 of the process of requesting such a letter. Plaintiff submitted a formal request for a letter of good standing of March 19, 2018, and several days later, on March 22, 2018, Dr. Chimienti sent a letter to Dr. Robert Rhinehart at the University of South Carolina.

Plaintiff speculates that Dr. Chimienti spoke with someone at the University of South Carolina and that, as a result of that alleged conversation, the University of South Carolina was not "so positive any further" toward him. To the contrary, Dr. Chimienti was not contacted by anyone from the University of South Carolina School of Medicine in response to her letter and did not speak with anyone from the University of South Carolina School of Medicine, or any other medical school, concerning Plaintiff.

Transcript and Tuition Charges

In March 2018, Dr. Chimienti advocated to Dean Flotte to waive Plaintiff's tuition charges from the 2016 Spring Semester, given that Dr. Saxena was not enrolled in any coursework during that two-week period. Dean Flotte waived these charges on March 21, 2018. On or about March 23, 2018, the hold on Dr. Saxena's ability to receive his transcript was lifted. On or about March 26, 2018, Plaintiff requested an official copy of his transcript.

Plaintiff claims that the Registrar prevented him from transferring by not allowing access to his transcript because of the hold and that this was discriminatory. The Registrar's Office provided Plaintiff with a copy of his transcript on or about March 26, 2018. Plaintiff testified that his transcript has errors, and that this was a deliberate attempt to interfere with his ability to transfer. Plaintiff believes that his transcript incorrectly lists him as having withdrawn from eight of the nine courses in which he was enrolled during FOM 2. Eight of the nine courses in which Plaintiff was enrolled during the 2015-2016 academic year were year-long courses. Six of these courses ended on March 18, 2016, one ended on May 6, 2016, and the other ended on May 20, 2016. Plaintiff's transcript correctly shows him having withdrawn from these eight courses in light of the fact that he was placed on an administrative leave of absence on January 19, 2016, after he did not comply with the Progress Board's conditions for his promotion to FOM2.

On April 3, 2018, Plaintiff informed Dr. Chimienti via email that he wished to continue with his program at the Medical School. Plaintiff also informed Dr. Chimienti that he had contacted the AAC as well. Dr. Chimienti understood from Plaintiff's email to her that he was requesting to come back to the Medical School with accommodations, and that he would be proceeding through the AAC. Dr. Chimienti responded to Plaintiff's email on April 3, 2018, confirming her understanding.

On April 3, 2018, Plaintiff requested an accommodation for his anatomy coursework.  To request an accommodation, Plaintiff needed to take the following steps: request an in-take meeting with Dr. DeMarco and Dr. Carpenter; submit a completed "Accommodation Request Form" to Dr. DeMarco and Dr. Carpenter; and produce written documentation of his alleged disability and its relationship to his accommodation request, which needed to be sent directly from his health care providers to Dr. DeMarco and Dr. Carpenter. Although Plaintiff had previously submitted documents to the AAC in connection with his prior accommodation request, new submissions were required. The AAC remained willing to review the information Dr. Saxena previously produced, in conjunction with the new material that needed to be submitted. Plaintiff was aware that he needed to complete this process by deadline of June 30, 2018. Dr. DeMarco advised Plaintiff of the steps he needed to take and the deadline for him to complete the accommodation process in a letter to him dated April 5, 2018.

On June 11, 2018, Dr. DeMarco received an email from a new attorney representing Plaintiff, Suzie Herold. Attorney Herold requested an in-take meeting with Dr. DeMarco and Dr. Carpenter on behalf of Plaintiff. Attorney Herold also informed Dr. DeMarco that Plaintiff would complete and submit the Accommodation Request Form and that Plaintiff would request the medical information that the AAC had requested. Dr. Carpenter and Dr. DeMarco were prepared to meet with Plaintiff on Wednesday, June 20 or Friday, June 22. Dr. DeMarco advised Plaintiff of her and Dr. Carpenter's availability via email on June 13, 2018. Plaintiff did not take accept their offer to meet with him. Further, despite Attorney Herold's representation that Plaintiff would be completing and submitting the Accommodation Request Form, Plaintiff did not do so, nor did he request the medical information. Plaintiff testified that he did not submit the Accommodation Request Form because he "thought it was discriminatory." Plaintiff also

testified that he felt that the AAC had changed their Accommodation Request Form to "target" him. Plaintiff claims that the Medical School changed the accommodation process by requiring documentation from a medical provider that is no more than six months old, whereas in 2014 when he first applied, the documentation from a medical provider only needed to be from within the past three years.

The Medical School amended its accommodations policy to require that medical documentation based on an evaluation that had occurred within the prior six months, or it would require updates or renewal. After consideration, the AAC amended its policy in this respect in recognition of the fact that the status of a medical condition might change or evolve over a period of time. This amended policy was applicable to all students. Plaintiff further claims that the Medical School also changed the accommodation process by requiring that the medical documentation to be produced contain an International Classification of Diseases ("ICD") diagnosis. Plaintiff believes that in 2014, the Policy only required documentation from a physician that was based on historical records. The Policy from 2014 did contain a requirement that the documentation contain an ICD diagnosis; it was not added in 2018.

Plaintiff testified that another example of how the Medical School allegedly changed the academic accommodations policy in 2018 to "target" him was because there were now two people involved in the accommodations process, Dr. DeMarco and Dr. Carpenter, where before it was only Dr. DeMarco. Dr. Carpenter had been a member of the AAC, and eventually became a Co-Chair. As Co-Chairs, Dr. Carpenter and Dr. DeMarco regularly worked together to handle student accommodation matters for many months before Plaintiff's new request for accommodations in April 2018.

43

Plaintiff testified that another example of how the Medical School allegedly changed the academic accommodations policy in 2018 to "target" him was because the Accommodation Request Form, which had been revised in 2017, stated how the AAC "may require and request additional documentation beyond what is submitted…," whereas the Policy did not include such language. It was the longstanding practice of the AAC, in accordance with applicable law, to request additional documentation from a student when it reasonably determined the documentation submitted by the student was insufficient.

Plaintiff did not complete the academic accommodations process by July 1, 2018. As result, Plaintiff was considered to have withdrawn from the Medical School.

Plaintiff argues that numerous actions that taken by the Medical School constitute discrimination and retaliation on the basis of his disability, including: asking Plaintiff to try the temporary accommodations, comments made to Plaintiff by faculty and administrators, requiring Plaintiff to go to the Progress Board in 2015, allegedly making Plaintiff take extra coursework, the Medical School allegedly changing the DSF curriculum, requiring Plaintiff to go on administrative leave of absence, charging Plaintiff for tuition based on his enrollment in January 2016, placing a hold on Plaintiff's transcript, and changing the academic accommodations process in 2018. Plaintiff believes that he has a disability and that the Medical School's conduct toward him was motivated by a discriminatory and retaliatory animus. Plaintiff asserts that the Medical School's motion for summary judgment must be denied and that he is entitled to summary judgment on his claims because the undisputed facts establish as a matter of law that the Medical School failed to reasonably accommodate his alleged disability and retaliated against him for disclosing his alleged disability in violation of the ADA and the Rehabilitation Act.[9]

---

[9] Plaintiff's Motion also claims that the Medical School "regarded him" as disabled simply because they offered him temporary accommodations. Initially, the Medical School objects to Plaintiff's attempt to assert a "regarded as"

The Medical School asserts that Plaintiff's motion for summary judgment must be denied and judgment instead entered in its favor because Plaintiff cannot prevail on his claims as a matter of law as the undisputed fact establish that his claim under ADA fails because his claims of wrongful conduct that occurred prior to January 7, 2016 are time-barred; that Plaintiff is not disabled within the meaning of the ADA or the Rehabilitation Act; that he is not a "qualified individual" with a disability; that Plaintiff did not participate in the interactive process in good faith with the Medical School; and that the Medical School can show legitimate, non-discriminatory reasons underlying its actions, precluding Plaintiff's claims for pretext and retaliation.

## CROSS-MOTIONS FOR SUMMARY JUDGMENT

### Standard of Review

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential32 of affecting the outcome of the case.'" *Sensing v. Outback*

---

disability discrimination claim. Specifically, Plaintiff's First Amended Complaint does not plead a claim that the Medical School regarded him as disabled. In the absence of having pled such a claim, Plaintiff cannot proceed on this theory of liability against the Medical School. *See Echevarria v. AstraZeneca, LP*, 133 F. Supp. 3d 372, 393 (D. P.R. 2015) ("Given that the complaint contains no 'regarded as' claim, no colorable 'regarded as' action has been properly raised, for '[i]t simply will not do for a plaintiff to fail to plead with adequate specific facts to support a regarded as claim, all-the while hoping to play that card if her initial hand is a dud").

Notwithstanding this, the "regarded as" prong of the ADA "exists to cover those cases in which myths, fears, and stereotypes affect the [school's] treatment of an individual, because Congress has recognized that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from the actual impairment." *Ruiz Rivera v. Pfizer Pharmaceuticals, LLC*, 521 F.3d 76, 82-83 (1st Cir. 2008). To prove that the Medical School regarded him as disabled, Plaintiff cannot merely show that the Medical School "perceived him as somehow disabled; rather, he must prove the [Medical School] regarded [him] as disabled within the meaning of the ADA." *Bailey v. Georgia–Pacific Corp.*, 306 F.3d 1162, 1169 (1st Cir. 2002).

*Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (*quoting Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the non-moving party and makes all reasonable inferences in favor thereof. *Sensing,* 575 F.3d at 153. The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.,* at 152. "'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.'" *Id.* (citation to quoted case omitted). "'[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." *Id.* (citation to quoted case omitted). The nonmoving party cannot rely on "conclusory allegations" or "improbable inferences". *Id.* (citation to quoted case omitted). "'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted).

"Cross-motions for summary judgment require the district court to 'consider each motion separately, drawing all inferences in favor of each non-moving party in turn.' " *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (citation to quoted case omitted). "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc. v. Ferré Dev., Inc.,* 241 F.3d 103, 107 (1st Cir. 2001). The Court need only "to determine whether either of the parties deserves

judgment as a matter of law on facts that are not disputed." *Id*. And while each motion for summary judgment will be decided on its own merits, because both the Defendants and the Plaintiff's respective motions for summary judgment were filed simultaneously, the Court will consider both motions at the same time, applying the same standard to each motion. *See P.R. American Ins. Co. v. Rivera-Vázquez*, 603 F.3d 125, 133 (1st Cir. 2010).

## Discussion

### Statute of Limitations

The Court will first address Defendant's motion for summary judgment on Plaintiff's claims that are based on actions and events that occurred prior to January 7, 2016 are time barred by the applicable statute of limitations, which the parties agree to be three years, pursuant to Mass. Gen. L. c. 260 § 2A. Plaintiff filed his Complaint with this Court on January 7, 2019, therefore claims related to this conduct would therefore appear to be time-barred. However, "[c]ourts have recognized a narrow exception to the limitations period via the 'continuing violation doctrine.' " *Willitts v. Engie N.A. Inc.*, 2023 WL 2573344, at *9 (D.Mass. Mar. 20, 2023), *citing* <u>Ayala v. Shinseki</u>, 780 F.3d 52, 57 (1st Cir. 2015) (citation omitted). Under the continuing violation doctrine, "a plaintiff may obtain recovery for discriminatory acts that otherwise would be time-barred so long as a related act [(often called an 'anchoring act')] fell within the limitations period." *Id*.

Defendants first contend that Plaintiff's claims were untimely as he filed suit with this Court on January 7, 2019, and based on a three-year statute of limitation, any allegedly wrongful conduct that took place prior to January 7, 2016 would be barred. Plaintiff disagrees and insists that the continuing violation doctrine saves his claims.

A party alleging employment discrimination may, in appropriate circumstances, file suit based on events that fall outside the applicable statutes of limitation. Under Massachusetts law, the continuing violation doctrine serves as an exception to the statute of limitations only if three prerequisites are satisfied. A plaintiff who seeks to derive the benefit of the continuing violation doctrine bears the burden of establishing all three of its elements. *See Shervin v. Partners Healthcare System, Inc.,* 804 F.3d 23, 34–35 (1st Cir. 2015), citing *Cuddyer v. Stop & Shop Supermkt. Co.,* 434 Mass. 521, 750 N.E.2d 928, 941–42 (2001).

First, the claim must be one that arises from "a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact." *Shervin, 804 F.3d* at 35. Second, the claim must be "anchored" by at least one incident of discrimination or retaliation transpiring within the limitations period. *Id*. This anchoring event must be "substantially relate[d]" to earlier instances of discrimination or retaliation and must contribute to the continuation of the pattern of conduct that forms the basis of the claim. *Id.* Third, the plaintiff must show that a reasonable person in his circumstances would have refrained from filing a complaint within the limitations period. *Id*. On this final element, the inquiry becomes whether the plaintiff knew or reasonably should have known within the limitations period both that his work environment was discriminatory and that the problems he attributed to that discriminatory environment were unlikely to cease. *Shervin*, 804 F.3d at 35. "As to the likelihood [ ] of improvement, the question is whether the plaintiff's 'delay in initiating the lawsuit, considered under an objective standard, was unreasonable.' " *Id.* Here, reading the Complaint generously in Plaintiff's favor, a reasonable person in Plaintiff's circumstances could have thought his situation would improve or the discrimination would cease within the

limitations period. Accordingly, any evidence of alleged wrongful conduct that occurred prior to

January 7, 2016 is not time-barred for the purposes of this motion.

ADA and Rehabilitation Act Claims

The ADA, which was enacted to protect disabled individuals, provides that "no qualified

individual with a disability shall, by reason of such disability, be excluded from participation in

or be denied the benefits of the services, programs, or activities of a public entity, or be subjected

to discrimination by any such entity. 42 U.S.C. § 12132. Under the ADA, an educational

institution such as The Medical School is required to make "reasonable modifications," for a

disabled student unless it "can demonstrate that making the modifications would fundamentally

alter the nature of the service, program or activity." 28 C.F.R. § 35/130(b)(7). Similarly, the

Rehabilitation Act recognizes that "individuals with disabilities continually encounter various

forms of discrimination in such critical areas as … education." 29 U.S.C. § 701. To combat such

discrimination, Section 504 provides that "[n]o otherwise qualified individual with a disability in

the United States … shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance …." 29 U.S.C. § 794(a). Practically speaking, this

requires federal funded academic institutions to make "academic adjustments" including

"modifications to … academic requirements as are necessary to ensure that such requirements do

not discriminate or have the effect of discriminating" and may require that certain rules be

suspended for handicap students where application of such rules would "have the effect of

limiting the participation of handicapped students in [such institution's program or activity." 34

C.F.R. § 104.44; 45 C.F.R. § 84.44.

Generally, courts construe the ADA and Rehabilitation Act to impose similar requirements. Thus, despite the different language that these statutes employ, they require a plaintiff to demonstrate the same elements to establish liability. In the context of a student excluded from an educational program, to prove a violation of either the ADA or Rehabilitation Act, the plaintiff must establish that: (1) he is disabled, (2) he is otherwise qualified to participate in the defendant's program, and (3) defendant excluded him from its program based on his disability. *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000). As to the third element, there are three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations. *See Nunes v. Massachusetts Dep't of Correction*, 766 F.3d 136, 144–45 (1st Cir. 2014). Plaintiff's assertion that he was discriminated against by the Medical School based on his disability relies on theories of disparate treatment and failure to accommodate and he bears the burden of proving each element of the claim. *See Parker* F.3d at 5.

As to the first element, Plaintiff alleges that he is disabled because of his sensitivity to formaldehyde, a condition he argues has affected him in laboratory settings. Having an impairment, however, is not enough to claim protection under the ADA. *See Whitlock v. Mac-Gray, Inc.*, 345 F.3d 44, 46 (1st Cir. 2003). In order to be considered disabled under the definition of the ADA, a person must "(1) have a physical or mental impairment that substantially limits one or more life activity; (2) have a record of having such impairment; or (3) be "regarded as" having such an impairment." *Cosme-Perez v. Municipality of Juana Diaz*, 110 F. Supp. 3d 357, 365 (D.P.R. 2015). Merely alleging impairment is not enough to claim protection under the ADA. *Id*. "[E]vidence of impairment which is supported only with a medical diagnosis or conclusory assertions of disability by a physician are insufficient to show

disability for purposes of the ADA." *Id*., (*quoting Perez v. Saint John's School*, 814 F. Supp. 2d. 102, 117 (D.P.R. 2011)). Plaintiff's impairment in this case is supported by notes from three physicians, Drs. Christiani, Zheng, and Harris. Per its policy with respect to non-obvious disabilities, the Medical School asked Plaintiff for more information from each respective doctor in order to decide whether to issue him an academic accommodation. The Medical School was not able make an informed decision pursuant to its policies because, despite repeated attempts, the Plaintiff did not allow the AAC to communicate with the doctors about the alleged disability. Therefore, he fails to establish the first element.

As to the second element, Plaintiff must establish that he is a "qualified individual" within the meaning of the ADA. Under the ADA, a qualified individual is one "who, with or without reasonable modifications to rules, policies, or practices... meets the essential eligibility requirements for … the participation in a program or activities provided by a public entity." 42 U.S.C. § 12131(2). Plaintiff has the burden to establish that he is a qualified individual. *Joseph M. v. Becker College*, 531 F. Supp. 3d 383, 396 (D.Mass. 2021). "In meeting this burden, [Plaintiff] must present sufficient evidence to show (1) that he could satisfy the essential eligibility requirements of the program, i.e., those requirements that bear more than a marginal relationship to the [program] at issue. And (2) if not, whether any reasonable accommodation by the [Medical School] would enable the [P]laintiff to meet these requirements.". *Id*. Plaintiff must prove that he is an individual who is otherwise qualified is able to meet all the program's requirements despite his handicap. *Id*.

The Medical School maintains that Plaintiff was incapable of meeting all of the medical school program's requirements and perform the essential functions of a medical school student. *See Mulloy v. Acushnet Co.*, 460 F.3d 141, 146 (1st Cir. 2006). While Plaintiff's request for an

51

academic accommodation was pending, he was held to the same standards as his fellow medical students, including participation in anatomy lab sessions. Except for the October 2014 calf heart dissection, however, Plaintiff did not participate in any anatomy lab dissection during the 2014-2015 academic year and was informed he would not receive passing grade in the DSF course. After Plaintiff voluntarily withdrew from the course, the BSAEB voted that Plaintiff would not be allowed to progress to his second year of medical school ("FOM2") because he did not complete DSF, and the matter was referred to the Progress Board.[10] The Progress Board allowed Plaintiff to be promoted to FOM2, but required that Plaintiff complete his anatomy lab requirements by February 2016.[11]  Plaintiff did not complete all required anatomy lab requirements in Fall 2015, and the BSAEB voted that Plaintiff should not continue M2.[12] *See Joseph M.*, 531 F. Supp. 3d at 396.

Furthermore, there is evidence on the record that shows that Plaintiff failed to comply with the Medical School's email policy, including rules that individually addressed e-mails should be responded to within 72 hours (excluding weekends and holidays). Plaintiff also failed to comply with the Medical School's Attendance, Rescheduling, and Withdrawing policy when he did not attend a M2 course meeting, six out of seven Organ Systems Disease group sessions, and another group session concerning musculoskeletal medicine and dermatology.

Plaintiff counters that he successfully completed FOM1 coursework with the exception of DSF and points to a letter from Dr. Chimienti stating this, but did not respond to whether his

---

[10] At the time, the AAC did not rule on Plaintiff's accommodation because Plaintiff had not provided the AAC with the documents it requested, and Plaintiff was able to develop an academic schedule pending the decision of the Progress Board.

[11] Plaintiff was advised of these conditions in August 2015, and that he needed to resolve his request for academic accommodation with the AAC. Two faculty members at the Medical School created a plan for Plaintiff to complete DSF by participating in the dissections he had not participated in. These included dissection-based labs, exercises, quizzes, and practical exams. The DSF course for the 2014-2015 school year included grade point deductions for unexcused absence at anatomy lab sessions.

failure to comply with the email and attendance policies at the Medical School affect his qualification in the Medical School program. While the weight of the evidence shows that Plaintiff was having difficulties keeping up with the Medical School's curriculum, the Court will assume *arguendo* that he has presented sufficient evidence to advance to the third element of the test, which will prove to be pivotal to his discrimination claim.

As to the third element, even if this Court were to recognize Plaintiff's alleged disability and that Plaintiff was "otherwise qualified" to participate in the M.D. program, there is no evidence on the record to show that Plaintiff was excluded from participation in, denied the benefits of the services, or subject to discrimination while a student at the Medical School because of that disability. *See Parker*, 225 F.3d at 5. "A plaintiff can make a threshold showing on this third element by offering indirect evidence of discrimination." *See el Kouni v. Trustees of Boston University*, 169 F. Supp.2d 1, 3 (D.Mass. 2001); *see also Katz v. City Metal Co.*, 87 F.3d 26, 30 (1st Cir. 1996); *McDonnell Douglas Corp.*, 93 S. Ct. 1817. " … Once the defendant has articulated a non-discriminatory justification for dismissing the plaintiff from the program, then the plaintiff must prove that the defendant's proffered justification is a mere pretext concealing its true discriminatory motive, namely, one motivated by plaintiff's disability and not by his lack of aptitude as a student." *el Kouni*, 169 F. Supp. 2d at 3; see also *Wynne v. Tufts University School of Medicine*, 976 F.2d 791, 796 (1st Cir. 1992). "When pretext is at issue in a discrimination case, it is a plaintiff's duty to produce specific facts which, reasonably viewed, tend logically to undercut the defendant's position . . . The plaintiff may neither 'rest[] merely upon conclusory allegations, improbable inferences, and unsupported speculation, nor measurably bolster his cause by hurling rancorous epithets and espousing tenuous insinuations'"

*Wynne*, 976 F.2d at 796(*citing Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)(citations omitted).

In order to overcome the Medical School's legitimate, non-discriminatory reasons for its decisions and be able to prove discrimination, Plaintiff is "required to show, unassisted by the original inference of discrimination, that the [Medical School's] proffered reason(s) [are] actually a pretext for discrimination of the type alleged." *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 823 (1st Cir. 1991). The "[p]retext analysis is more demanding than the assessment of whether a prima facie case has been established…. It moves the inquiry to a new level of specificity." *Echevarria v. AstraZeneca, LP*, 133 F. Supp. 3d 372, 403 (D. P.R. 2015). Plaintiff must point to specific facts to support the argument that the stated reasons for the Medical School's actions were "not only a sham, but a sham intended to cover up [it's] real… motive of [disability] discrimination." *Bonefont-Igaravidez v. Int'l Shipping Corp.,* 659 F.3d 120, 125 (1st Cir. 2011). Plaintiff's disparate treatment claim is premised on his belief the Medical School harbored a discriminatory animus against him.

Here, the record is replete with Medical School's attempts to engage with Plaintiff over the course of several years to address his requests and potential need for accommodation. The Medical School has produced a mountain of credible evidence demonstrating its willingness to work with Plaintiff and find a solution that would allow him to proceed with his medical education  There is also ample evidence that the Medical School attempted to engage in a good faith, interactive dialogue with Plaintiff, but its efforts were not reciprocated by him which led to a breakdown in the interactive process. Being required to participate in an interactive process is not an adverse action. Moreover, seeking additional information from, and requesting permission to speak to, Plaintiff's physicians, was eminently reasonable under the circumstances in light of the serious deficiencies in the medical information Plaintiff provided to the AAC. *E.E.O.C. v.*

*Kohl's Dept. Stores, Inc.*, 774 F.3d 127, 132 (1st Cir. 2014), "[A]n employer cannot be found to have violated the ADA when responsibility for the breakdown of the 'informal, interactive process' is traceable to the employee and not the employer." (*quoting Beck v. Univ. of Wis. Bd. of Regents,* 75 F.3d 1130, 1135 (7th Cir.1996))). Plaintiff's refusal to participate in further meetings with the AAC or to provide the AAC with the required medical documentation is evidence of him not putting forth a good faith effort to participate in the interactive process. *EEOC v. Kohl's*, 774 F.2d at 133, *citing Phelps v. Optima Health, Inc.,* 251 F.3d 21, 27 (1st Cir. 2001) (holding plaintiff responsible for the breakdown in the interactive process when she "failed to cooperate in such a process"). Accordingly, no reasonable jury could find that the Medical School's reasons were a pretext for disability discrimination, and Plaintiff's argument of disparate treatment due to his alleged disability "consist[s] of unsubstantiated conclusions, backed only by a few uncoordinated evidentiary fragments. More is required to forestall summary judgment." *Wynne*, 976 F.2d 791 at 796.

Retaliation Claims

To make out a prima facie case of retaliation, Plaintiff must demonstrate that he (i) engaged in protected conduct, (ii) was subjected to an adverse action by the defendant, and (iii) there was a causal connection between the protected conduct and the adverse action. *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 41 (1st Cir. 2012).[13]  If Plaintiff establishes a prima facie case, the burden shifts to the Medical School to articulate a legitimate, non-retaliatory explanation for the adverse action. *Id.* Once the Medical School meets its obligation, the burden shifts back to the Plaintiff to show that the proffered legitimate explanation is a pretext and that the Medical School was, in actuality, motivated by a retaliatory animus. *Id.*

---

[13]  The standard for retaliation claims under the ADA and Rehabilitation Act is the same.  *Id.*

Plaintiff argues that he was subject to retaliation when he was not granted an academic accommodation, when he was required to provide supplemental medical information in order to obtain an accommodation,  and when he experienced alleged negative encounters with employees of the Medical School. Plaintiff further contends that the Medical School changed its requirements for an accommodation each time he requested one, held him to a higher standard than his fellow medical students, requiring him to waive his HIPAA rights to secure an accommodation and breaching his privacy, placing him on administrative leave and deliberately interfering with his ability to complete medical school at the Medical School and other medical schools across the country. Citing to the First Circuit in *Sepulveda-Vargas v. Caribbean Restaurant, LLC*, the Medical School argues that the only action that the Plaintiff claims could plausibly be considered as "materially adverse" is being placed on an administrative leave of absence in January 2016 following the Progress Board's recommendation that Plaintiff would not continue with FOM2.[14]

Plaintiff's request for an accommodation with respect to the anatomy lab sessions constitutes a protected activity, and it is undisputed that Plaintiff was put on administrative leave before later withdrawing from the Medical School, so viewed in a light most favorable to the Plaintiff, he clears the first two hurdles of the test. To demonstrate the third element, causation, Plaintiff must proffer evidence that but-for engaging in protected conduct, he would not been subject to an adverse action. *Palmquist v. Shinseki*, 689 F. 3d 66, 74 (1st Cir. 2012). Therefore, Plaintiff must prove that requesting an academic accommodation (and all of the actions he

---

[14] In that case, the First Circuit held that "[n]ot all retaliatory actions…suffice to meet the ADA's anti-retaliation provision. Rather, a plaintiff must show that a reasonable [student] would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable [student] from making or supporting a charge of discrimination." *Sepulveda-Vargas v. Caribbean Restaurant, LLC*, 888 F.3d 549, 555 (1st Cir. 2018).  For "retaliatory action to be material, it must produce a significant, not trivial harm and actions like petty slights, minor annoyance, and simply lack of good manners will not [normally] create such deterrence." *Id*.

claimed that followed) was the determinative factor in the Medical School's decision to place him on administrative leave.

Plaintiff claims that, but for him seeking an academic accommodation and engaging in protected conduct, he would not have been subject to adverse action by the Medical School. The Medical School contests that Plaintiff's dismissal from the program was not an "adverse action" because it considered the Plaintiff to have voluntarily withdrawn from the Medical School after he did not return from his leave of absence and did not comply with the Medical School's academic accommodations process. Plaintiff's withdrawal from the school was a result of reaching the maximum allowed time on administrative leave of absence. Plaintiff was advised of what he needed to complete in order to rematriculate as a student at the Medical School and did not complete required procedures by the deadline.

The record does not show that Plaintiff was held to a higher standard than his fellow students. The changes to the DSF curriculum were equally applicable to all students, and made for legitimate reasons described at length by Prof. Gilroy. Moreover, Plaintiff was not forced to find his own accommodation; rather, he was simply asked to comply with the AAC's requests. In addition, the fact that the Medical School did not provide Plaintiff an academic accommodation was not because it held him to a higher standard than fellow students; rather, it was because he continuously failed to comply with the AAC's requests and participate in the interactive dialogue in good faith. Furthermore, the AAC's request to speak with Plaintiff's physicians concerning their respective notes and evaluation of Plaintiff was made as part of its efforts to engage in an interactive dialogue with Plaintiff. Moreover, Dr. Gagliardi and Dr. DeMarco's communications with Dr. DiFranza concerning his evaluation of Plaintiff were reasonable and appropriate under the circumstances.

The Medical School did not interfere with Plaintiff's ability to transfer to another medical school by placing a hold on his student account. The hold placed on his account was done pursuant to Medical School policy – applicable to all students – because the Plaintiff had an unpaid balance in spring 2016, which was later waived by the Dean. In addition, the Registrar's Office provided Plaintiff with an accurate copy of his transcript in March 2018 when Plaintiff requested it and Dr. Chimienti provided Plaintiff with a letter in connection with his transfer application. Plaintiff was required to attend the Progress Board, first in July 2015, and again in December 2015, not because the Medical School was retaliating against him for requesting an accommodation, but because he withdrew from DSF in February 2015, and because he failed to comply with the Progress Board's requirements for provisional promotion to FOM2. Plaintiff was placed on an administrative leave of absence in January 2016 because of his failure to comply with the Progress Board's conditions. Finally, Plaintiff was considered to have voluntarily withdrawn from the Medical School as of July 1, 2018 because he failed to return from his administrative leave of absence, which had reached its maximum length. Although Plaintiff had been explicitly advised of the steps he needed to take to rematriculate, he did not comply with the Medical School's directive to complete the academic accommodations process by July 1, 2018.

Viewing the record in the light most favorable to Plaintiff, the Medical School's decision to place Plaintiff on an administrative leave of absence and subsequent withdrawal from the medical school was not an adverse action causally connected to the protected conduct of applying for an academic accommodation. Plaintiff has not presented a case of prima facie retaliation, however his argument must fail even if a prima facie case of retaliation is found in this case because the Medical School has legitimate reasons for each adverse and discriminatory

action the Plaintiff alleges. The Medical School offered Plaintiff legitimate, temporary accommodations pursuant to its policies and Plaintiff did not comply with those conditions. Further, Plaintiff was placed on leave of absence because he did not comply with the requirements the Medical School set for him to be promoted to FOM2 after he withdrew from DSF. The reasons for Plaintiff being placed on administrative leave are numerous, attributable to the Plaintiff and not causally connected to the protected activity of applying for academic accommodation.

After the Medical School provides a legitimate reason for their action(s), "the ultimate burden falls on the plaintiff to show that the employer's proffered reason is pretext masking retaliation . . ." *Wright v. CompUSA, Inc.,* 352 F.3d 472, 478 (1st Cir. 2003); see *D.B.*, 675 F.3d at 41 ("The burden shifts back to the plaintiff to show that the proffered legitimate explanation is pretextual, meaning that the defendant was motivated by a retaliatory animus").[15] "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Gomez-Gonzalez v. Rural Opportunities, Inc.*, 626 F.3d 654, 662-63 (1st Cir. 2010) (*citing Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)). Accordingly, because Plaintiff cannot establish a prima face case of retaliation, the Medical School is entitled to judgment as a matter of law.

---

[15]      "On summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus." *Gomez-Gonzalez*, 626 F.3d at 662(*citing Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir. 1996)).

**Conclusion**

1. The Medical School's Motion for Summary Judgment (Docket No. 124) is **granted**;

2. Plaintiff's Motion for Summary Judgment (Docket No. 127) is **denied**;

3. The Medical School's Motion to Strike Plaintiff's Statement of Material Facts (Docket No. 139) is **granted**;

4. The Medical School's Motion to Strike Plaintiff's Opposition (Docket No. 147) to its Motion is **granted** in part and **denied** in part;

5. Plaintiff's Motion to Accept Affidavit in Support of Motion for Summary Judgment (Docket No. 154) is **denied**;

6. Plaintiff's Motion to Certify Interlocutory Appeal (Docket No. 180) is **denied**;

7. Plaintiff's Motion to Certify Interlocutory Appeal (Docket No. 182) is **denied**; and

8. Plaintiff's Motion for Leave to File Electronically (Docket No. 186) is **denied**.


**SO ORDERED**.

/s/ *Timothy S. Hillman*
TIMOTHY S. HILLMAN
UNITED STATES SENIOR DISTRICT JUDGE